# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP1652 |
| COMPLETE TITLE: | Milwaukee Branch of the NAACP, Voces de La Frontera, Ricky T. Lewis, Jennifer T. Platt, John J. Wolfe, Carolyn Anderson, Ndidi Brownlee, Anthony Fumbanks, Johnnie M. Garland, Danettea Lane, Mary McClintock, Alfonso G. Rodriguez, Joel Torres and Antonio K. Williams, Plaintiffs-Respondents, v. Scott Walker, Thomas Barland, Gerald C. Nichol, Michael Brennan, Thomas Cane, David G. Deininger and Timothy Vocke, Defendants-Appellants, Doris Janis, James Janis and Matthew Augustine, Intervenors-Co-Appellants. |

ON BYPASS FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 31, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 24, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Daniel T. Flanagan III |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ABRAHAMSON, C.J., dissents. (Opinion filed.) CROOKS, BRADLEY, JJ., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendants-appellants, the cause was argued by *Clayton P. Kawski*, assistant attorney general, with whom on the briefs (in the court of appeals) was *Thomas C. Bellavia*, *Carrie M. Benedon*, and *Maria S. Lazar*, assistant attorneys general; and *J.B. Van Hollen*, attorney general.

For the intervenors-co-appellants, the cause was argued by *Michael T. Morley*, Washington D.C.; with whom on the briefs (in the court of appeals) was *Joseph Louis Olson* and *Michael Best & Friedrich LLP*, Milwaukee.

For the plaintiffs-respondents, the cause was argued by *Richard Saks*, with whom on the brief (in the court of appeals) was *B. Michele Sumara*, and *Hawks Quindel, S.C.*, Milwaukee.

An amicus curiae brief (in the court of appeals) was filed by *Helen Marks Dicks* and *AARP Wisconsin*, Madison; and *Daniel B. Kohrman* and *AARP Foundation Litigation*, Washington, D.C., on behalf of AARP.

An amicus curiae brief (in the court of appeals) was filed by *Jennifer A. Lohr*, Madison, on behalf of Disability Rights Wisconsin.

An amicus curiae brief (in the court of appeals) was filed by *Rebecca K. Mason* and *Rebecca Mason Law LLC*, Racine, on behalf of Institute for One Wisconsin, Inc.

An amicus curiae brief was filed by *Kristin M. Kerschensteiner*, Madison, on behalf of Disability Rights Wisconsin.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No.  2012AP1652
(L.C. No.  2011CV5492)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Milwaukee Branch of the NAACP, Voces de la Frontera, Ricky T. Lewis, Jennifer T. Platt, John J. Wolfe, Carolyn Anderson, Ndidi Brownlee, Anthony Fumbanks, Johnnie M. Garland, Danettea Lane, Mary McClintock, Alfonso G. Rodriguez, Joel Torres and Antonio K. Williams,**

      **Plaintiffs-Respondents,**

  **v.**

**Scott Walker, Thomas Barland, Gerald C. Nichol, Michael Brennan, Thomas Cane, David G. Deininger and Timothy Vocke,**

      **Defendants-Appellants,**

**Doris Janis, James Janis and Matthew Augustine,**

      **Intervenors-Co-Appellants.**

**FILED**

**JUL 31, 2014**

Diane M. Fremgen
Clerk of Supreme Court

APPEAL from a circuit court judgment and permanent injunction. *Judgment reversed; permanent and temporary injunctions vacated.*

¶1  PATIENCE DRAKE ROGGENSACK, J.  This appeal arises from a judgment of the Dane County Circuit Court[1] granting

---

[1] The Honorable David T. Flanagan, III presided.

declaratory and injunctive relief based on the circuit court's conclusion that 2011 Wis. Act 23, Wisconsin's voter photo identification act, violates the Wisconsin Constitution.

¶2 Plaintiffs challenge Act 23 under Article III, Section 1 of the Wisconsin Constitution.[2] They contend that the law is invalid because "it would severely burden a significant number of qualified voters but [is] not reasonably necess[ary] or designed to deter fraud or otherwise effect an important government interest." Plaintiffs identify burdens of time, inconvenience and costs associated with Act 23. Emphasizing the difficulties that facial challenges to a statute bear, defendants contend plaintiffs have not shown that Act 23 is anything more than a reasonable, election-related regulation or that the law's requirements amount to a denial of the right to vote.

---

[2] Article III, Section 1 provides:

> Electors. Section 1. Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district.

In their complaint, plaintiffs alleged that Act 23 also violated Article I, Section 1 of the Wisconsin Constitution, which guarantees equal protection and due process under the law in a manner similar to the Fourteenth Amendment to the United States Constitution. In their brief to us, plaintiffs refer only to Article III, Section 1 of the Wisconsin Constitution. However, they also contend that there is "a single standard to apply to all challenges to restrictive voting laws, whether brought as equal protection and due process challenges or under the fundamental right to vote," and their arguments are in most respects consistent with arguments made in due process and equal protection challenges.

¶3 We conclude that plaintiffs have failed to prove Act 23 unconstitutional beyond a reasonable doubt. In League of Women Voters of Wisconsin Education Network, Inc. v. Walker, 2014 WI 97, __ Wis. 2d __, __ N.W.2d __, also released today, we concluded that requiring an elector to present Act 23-acceptable photo identification in order to vote is not an additional elector qualification. Id., ¶__. In the present case, we conclude that the burdens of time and inconvenience associated with obtaining Act 23-acceptable photo identification are not undue burdens on the right to vote and do not render the law invalid.

¶4 We conclude, as did the United Stated Supreme Court in Crawford v. Marion County Election Board, 553 U.S. 181 (2008), that "the inconvenience of making a trip to [a state motor vehicle office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote." Id. at 198. Furthermore, photo identification is a condition of our times where more and more personal interactions are being modernized to require proof of identity with a specified type of photo identification. With respect to these familiar burdens, which accompany many of our everyday tasks, we conclude that Act 23 does not constitute an undue burden on the right to vote. Payment to a government agency, however, is another story.

¶5 Act 23 provides that the Department of Transportation (DOT) "may not charge a fee to an applicant for the initial issuance, renewal, or reinstatement of an identification card"

3

when "the applicant requests that the identification card be provided without charge for purposes of voting." Wis. Stat. § 343.50(5)(a)3. (2011-12).[3] On its face, then, the law prohibits a government or its agencies from requiring any elector, rich or poor, to pay a fee as a condition to obtaining a DOT photo identification card to vote.[4] See Harper v. Va. Bd. of Elections, 383 U.S. 663, 666 (1966) ("payment of any fee [may not be] an electoral standard"). The mandate of Act 23 is consistent with the Wisconsin tradition of "jealously guard[ing] and protect[ing]" the fundamental right to vote. See State ex rel. Frederick v. Zimmerman, 254 Wis. 600, 613, 37 N.W.2d 473 (1949).

¶6 Plaintiffs produced evidence at trial that, in the course of obtaining a DOT photo identification card for voting, government agencies charged them fees to obtain supporting documents for their applications. A common example is a birth certificate, which is satisfactory proof of name, date of birth and citizenship, and can cost $20 to obtain. E.g., Wis. Stat. § 69.22(1)(a) and (c). The requirement for such documents arose under Wisconsin administrative rules that implement Act 23. E.g., Wis. Admin. Code § Trans 102.15(3)(a).

---

[3] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

[4] We address only the financial burden incurred while obtaining a DOT photo identification card for voting, see Wis. Stat. § 343.50, because the other forms of Act 23-acceptable identification are required for purposes other than voting, e.g., driver licenses are required to lawfully drive a vehicle.

¶7 In order to resolve the conflict between Act 23 and Wis. Admin. Code § Trans 102.15(3)(a), we interpret the administrative rules and explain that the discretion of the Division of Motor Vehicles (DMV) administrators must be exercised in a constitutionally sufficient manner. Such exercise of discretion requires the issuance of DOT photo identification cards for voting without requiring documents for which an elector must pay a fee to a government agency.[5] See Wis. Admin. Code § Trans 102.15(3)(b) and (c) (permitting issuance of DOT photo identification cards for voting without the documents described in § Trans 102.15(3)(a)). Our conclusion employs a saving construction of § Trans 102.15(3)(b), conforms to Act 23's mandate and relieves a severe burden on the right to vote that would otherwise exist. Because with a saving construction of § Trans 102.15(3)(b) Act 23 does not place a severe burden on the right to vote, we apply rational basis scrutiny and conclude that Act 23 is reasonably related to the State's significant interests.

---

[5] Put simply, the right to vote cannot require payment to a government or its agencies. This includes, of course, a "poll tax," where a government directly requires and itself collects a payment in order to vote. See Harper v. Va. Bd. of Elections, 383 U.S. 663 (1966). It also includes, however, fees that a government agency other than a Wisconsin agency may charge for documents necessary to obtain a DOT photo identification card for voting. We cannot require other governments or their agencies to refrain from charging such fees. We can, however, explain that in order to constitutionally administer Act 23, the DMV may not require documents in order to issue a DOT photo identification card for voting that require payment of a fee to any government agency.

¶8    We have been mindful that the task before us is not to determine whether "Act 23 is the best way to preserve and promote the right to vote." League of Women Voters, __ Wis. 2d __, ¶55.   Such "policy determinations . . . are not properly addressed to the members of the Supreme Court of Wisconsin." MTI v. Walker, 2014 WI 99, ¶181, __ Wis. 2d __, __ N.W.2d __ (Crooks, J., concurring).

¶9    Instead, we apply judicial restraint and constitutional principles to the case at hand.   Accordingly, we reverse the judgment of the circuit court and vacate the injunctions the circuit court issued.

## I.   BACKGROUND

### A.   Parties

¶10  Plaintiffs are the Milwaukee Branch of the NAACP, Voces de la Frontera and numerous individuals residing either in Milwaukee County or in Polk County.   The NAACP, an incorporated association with its business address in the City of Milwaukee, contends that "Act 23 will force the Milwaukee Branch of the NAACP to divert substantial resources away from traditional voter registration and voter turnout efforts in order to educate and assist voters in procuring Act 23-acceptable photo ID." NAACP alleges that Act 23 unconstitutionally burdens Wisconsin African-American residents' right to vote.

¶11  Voces is Wisconsin's preeminent immigration rights organization.   It expresses strong concerns about the burden Act 23 will place on the Latino community and its members as they seek to exercise their franchise.   Voces alleges that "Act 23

6

will force Voces to divert substantial resources away from traditional voter registration and voter turnout efforts in order to educate and assist voters in procuring Act 23-acceptable photo ID."

### B. Act 23

¶12 Act 23, with a few limited exceptions, requires electors to identify themselves by presenting Act 23-acceptable photo identification in order to vote. Stated generally, these include: DOT issued driver's license; DOT issued photo identification card; an unexpired DOT photo identification card receipt; United States uniformed service identification card; United States passport; United States naturalization certificate issued within two years preceding the election; federally recognized Wisconsin Native American tribe's identification card; Wisconsin university or college student identification card; and citation or notice of driver's license suspension. Wis. Stat. § 5.02(6m). Our review focuses on the second form of acceptable identification, which we refer to as a DOT photo identification card for voting. See Wis. Stat. § 343.50.

¶13 The DMV is the division of the DOT charged with issuing DOT photo identification cards for voting spoken to in Act 23. DOT administrative rules governing DMV's process for issuing these cards require an applicant to document name, birth date, identity, residence and citizenship. A social security card and numerous other documents are proof of identity. Wisconsin Admin. Code § Trans 102.15(4)(a)13. An applicant may prove residence by items such as a utility bill, paycheck stub

7

or similar document that shows name and address. § Trans 102.15(4m).

¶14 A certified copy or an original birth certificate is satisfactory proof of name, date of birth and citizenship. Wis. Admin. Code § Trans 102.15(3)(a). Wisconsin Stat. § 69.21 describes how to obtain vital records, including certified copies of birth certificates, for those applicants born in Wisconsin. Wisconsin Stat. § 69.22(1)(a) and (c) permit a government agency to assess a $20 fee for a certified copy of a birth certificate.[6] Other states presumably have their own procedures, which may similarly allow a government agency to charge a fee.

## C. Procedural History

¶15 On March 6, 2012, the circuit court temporarily enjoined the enforcement of Act 23. On April 16-19, April 30, and May 4, 2012, the court conducted a bench trial. During the trial, plaintiffs testified about the burdens of time and inconvenience of going to DMV offices to obtain Act-23 acceptable identification. They also testified about the cost of documents the DMV requires in order to issue a DOT photo identification card for voting. These costs included payment to

---

[6] Wisconsin Stat. § 69.22(6) provides that the "register of deeds may provide free searches and free copies [of vital records] to agencies in his or her county at the direction of the county board." However, there is no mention in § 69.22 of providing free certified copies of birth certificates or other vital records that have been required to obtain DOT photo identification cards to vote.

8

government agencies in various states, including Wisconsin, to secure a certified copy of a birth certificate.

¶16 On July 17, 2012, the circuit court declared Act 23's photo identification requirements unconstitutional, and granted permanent injunctive relief. The circuit court reasoned that "[t]he cost and the difficulty of obtaining documents necessary to apply for a DMV Photo ID is a significant burden upon the opportunity of Wisconsin citizens to vote." It further concluded that these burdens "constitute a substantial impairment of the right to vote" and are therefore "inconsistent with, and in violation of Article III, Section 1 of the Wisconsin Constitution."

¶17 The circuit court made extensive findings of fact. For example, the court found that 80 percent of Wisconsin voters had a DOT-issued driver's license, which is an Act 23-acceptable identification, but that there were potentially thousands of otherwise qualified voters who currently lack Act 23-acceptable identification. The court made no finding of how many of those otherwise qualified voters could not obtain Act 23-acceptable identification. The court found that two electors, Ruthelle R. Frank and Ricky T. Lewis, had not secured photo identification cards due to problems in obtaining corrected birth certificates. The court also found that obtaining a certified copy of a birth certificate required payment to a government agency.

¶18 On November 20, 2013, after briefing was completed in the court of appeals and pursuant to Wis. Stat. § 809.61 and

9

Wis. Const. Art. VII, § 3(3), we took jurisdiction of the appeal on our own motion.[7]

## II.  DISCUSSION

¶19  Plaintiffs bring a facial challenge to Act 23 under the Wisconsin Constitution, arguing that the time, inconvenience and costs incurred in obtaining Act 23-acceptable photo identification impermissibly burden their right to vote.

---

[7] We note that the District Court for the Eastern District of Wisconsin declared that Act 23 violated the federal constitution in Frank v. Walker, Nos. 11CV1128 and 12CV185, 2014 WL 1775432 (E.D. Wis. Apr. 29, 2014). The court did so knowing that the question of whether the voter identification law is constitutional was before us. Id. at *42 n.1. Federal court interpretation of a state statute prior to precedential state court interpretation is most unusual because if a saving construction by the state court is possible, then facial invalidation of the statute is inappropriate. See, e.g., Harrison v. NAACP, 360 U.S. 167, 176 (1959) (concluding that "no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them"). This is known as "Pullman abstention." See R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 499-500 (1941).

> Pullman abstention requires federal courts to abstain from deciding an unclear area of state law that raises constitutional issues because state court clarification might serve to avoid a federal constitutional ruling. . . . [F]ederal courts should retain jurisdiction over the case, but stay the proceedings so that state courts can rule on the state law question. If the state court fails to resolve the issue, however, the parties may then return to federal court for a ruling on the constitutional issue.

Nivens v. Gilchrist, 444 F.3d 237, 245-46 (4th Cir. 2006) (citation omitted).

Plaintiffs do not assert that the actual presentation of photo identification violates their constitutional right to vote. Therefore, their challenge is made on a different legal basis than that of the plaintiffs in League of Women Voters.

¶20 Defendants maintain that Act 23 is constitutional. They argue that the burdens imposed on electors to obtain a DOT photo identification card are minimal when compared to the State's significant interest in protecting the integrity and reliability of the electoral process, in maintaining public confidence in election results and in preventing voter impersonation fraud.

A. Standard of Review

¶21 Plaintiffs bring a facial challenge to Act 23. A facial challenge presents a question of law that we review independently, but benefitting from the discussion of the circuit court. Custodian of Records for the Legislative Tech. Servs. Bureau v. State, 2004 WI 65, ¶6, 272 Wis. 2d 208, 680 N.W.2d 792; State v. Wood, 2010 WI 17, ¶15, 323 Wis. 2d 321, 780 N.W.2d 63. Because this appeal follows a trial to the circuit court, we will uphold that court's historic findings of fact unless they are clearly erroneous. State v. Arias, 2008 WI 84, ¶12, 311 Wis. 2d 358, 752 N.W.2d 748.

¶22 If we conclude that a voter regulation creates a severe burden on electors' right to vote, we will apply strict scrutiny to the statute, and conclude that it is constitutional only if it is narrowly drawn to satisfy a compelling state interest. See Wagner v. Milwaukee Cnty. Election Comm'n, 2003

11

WI 103, ¶77, 263 Wis. 2d 709, 666 N.W.2d 816; see also Milwaukee Cnty. v. Mary F.-R., 2013 WI 92, ¶35, 351 Wis. 2d 273, 839 N.W.2d 581. On the other hand, if we conclude that the burden on the electors' right to vote is not severe, the legislation will be presumed valid, and we will apply a rational basis level of judicial scrutiny in determining whether the statute is constitutional. Mary F.-R., 351 Wis. 2d 273, ¶35.

### B. Challenge to Act 23 Burdens

#### 1. Foundational principles

¶23 Without question, the right to vote is a fundamental right and in many respects, it is protective of other rights. Frederick, 254 Wis. at 613; Clingman v. Beaver, 544 U.S. 581, 599 (2005). As Justice Brennan explained so long ago, "the right to vote is 'a fundamental political right, because [it is] preservative of all [other] rights.'" Storer v. Brown, 415 U.S. 724, 756 (1974) (Brennan, J., dissenting) (quoting Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).

¶24 Foundational legal principles are our starting point when fundamental rights are at issue. One such principle is that generally, statutes are presumed to be constitutional. Tammy W-G. v. Jacob T., 2011 WI 30, ¶46, 333 Wis. 2d 273, 797 N.W.2d 854. However, the way in which we address this presumption may vary depending on the nature of the constitutional claim at issue. See League of Women Voters, 2014 WI 97, ¶16, __ Wis. 2d __. The presumption of constitutionality is based on the court's respect for a co-equal branch of government, and it is meant to promote due deference to

12

legislative acts.  Dane Cnty. Dep't of Human Servs. v. Ponn P., 2005 WI 32, ¶16, 279 Wis. 2d 169, 694 N.W.2d 344.  In addition, given a choice of reasonable interpretations of a statute, we must select the interpretation that results in constitutionality.  Am. Family Mut. Ins. Co. v. DOR, 222 Wis. 2d 650, 667, 586 N.W.2d 872 (1998).

¶25 One who challenges a statute on constitutional grounds has a very heavy burden to overcome.  Dowhower v. W. Bend Mut. Ins. Co., 2000 WI 73, ¶10, 236 Wis. 2d 113, 613 N.W.2d 557.  To succeed, the challenger must prove that the statute is unconstitutional beyond a reasonable doubt.  State v. Cole, 2003 WI 112, ¶11, 264 Wis. 2d 520, 665 N.W.2 328.  While this burden of proof is often associated with the requisite proof of guilt in a criminal case, in the context of a challenge to the constitutionality of a statute, the phrase "beyond a reasonable doubt" expresses the "force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional before the statute or its application can be set aside."  Ponn P., 279 Wis. 2d 169, ¶18.  Furthermore, courts must resolve any doubt about the constitutionality of a statute in favor of upholding the statute.  Monroe Cnty. Dep't of Human Servs. v. Kelli B., 2004 WI 48, ¶16, 271 Wis. 2d 51, 678 N.W.2d 831.

## 2.  Voter rights

¶26 When courts approach constitutional challenges that allege a burden on the right to vote, we focus first on how the right is burdened.  The analysis by which we do so is more

nuanced than that set out above. Decisions of the United States Supreme Court, as well as our own decisions that relate to voting, provide discussions helpful to determining how to structure our examination of the plaintiffs' claims and the circuit court's conclusions.

¶27 For example, in Anderson v. Celebrezze, 460 U.S. 780 (1983), the Supreme Court examined whether an Ohio statute's requirement that an independent candidate for President file his statement of candidacy and nominating petition more than five months before party candidates were required to file, placed an unconstitutional burden on voting and associational rights of the candidate's supporters under the First and Fourteenth Amendments. Id. at 786 n.7, 790-91.

¶28 The Supreme Court began by noting that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Id. at 788 (quoting Storer, 415 U.S. at 730). The Court then explained that voter regulation laws "inevitably affect[]──at least to some degree──the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." Id.

¶29 The Court said that there was no "litmus-paper test" that can separate valid from invalid voting regulations. Id. at 789. Instead, a court must first consider "the character and magnitude of the asserted injury to the rights protected by the

14

First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Id. The Court analyzed the facts supporting the alleged burdens on supporters of independent candidates and concluded that "[t]he inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." Id. at 793 (citation and internal quotation marks omitted).

¶30 The Court then took up the precise interests identified by the State: "voter education, equal treatment for partisan and independent candidates, and political stability," and examined the "legitimacy" of the stated interests and the extent to which the early filing deadline served those interests. Id. at 796. The Court concluded that given modern communications, particularly those that occur in presidential elections, it was not clear that the early filing requirement aided voter education. Id. at 798. The Court also concluded that there was "no merit in the State's claim that the early filing" assisted in treating partisan and independent candidates equally. Id. at 799.

¶31 Nowhere in the majority opinion did the Court describe whether it was applying rational basis or strict scrutiny to the Ohio statute. Rather, the Court seemed to balance the burden on the individual's First and Fourteenth Amendment rights with the specific interests the State sought to promote. However, it is important to note that although the law directly limited how one

15

could become a nonpartisan candidate, it was the indirect restriction on the voters' right to have a choice of candidates that drove the Court's decision.

¶32  In Burdick v. Takushi, 504 U.S. 428 (1992), another case related to burdens on the right to vote, the Supreme Court continued to focus its discussion on the rights being burdened. There, Hawaii's lack of a provision to permit write-in voting was challenged as an impermissible burden on First and Fourteenth Amendment protections.  Because only one candidate filed nomination papers for a state legislative seat, the petitioner wanted to mount a write-in campaign and was told that Hawaii made no provision for write-in candidates.  Id. at 430.

¶33  As the Court began its discussion, it explained that "Petitioner proceeds from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny.  Our cases do not so hold."  Id. at 432. The Court instructed that only "severe restrictions" by the State would require a compelling state interest and that "reasonable, nondiscriminatory" regulations were permissible. Id. at 434.

¶34  The Court concluded that the burden imposed by Hawaii's lack of a provision for write-in voting was "slight"; therefore, the State "need not establish a compelling interest to tip the constitutional scales in its direction."  Id. at 439. The Court then applied rational basis scrutiny and concluded that "[t]he State has a legitimate interest . . . and the write-

16

in voting ban is a reasonable way of accomplishing this goal." Id. at 440.

¶35  In Crawford, the Supreme Court decided a challenge to Indiana's statutory requirement that an elector identify himself by presenting a government-issued photo identification in order to vote.  Crawford, 553 U.S. at 185.  The complainants, who represented among others, "groups of elderly, disabled, poor, and minority voters," alleged that the law "substantially burdens the right to vote in violation of the Fourteenth Amendment" and that it will "arbitrarily disfranchise qualified voters who do not possess the required identification and will place an unjustified burden on those who cannot readily obtain such identification."  Id. at 187.

¶36  In upholding the constitutionality of the Indiana statute, six members of the Court applied the Burdick/Anderson analysis, although the lead opinion, authored by Justice Stevens, and the concurrence, authored by Justice Scalia, applied the analysis somewhat differently.  In the first step of that analysis, six justices examined whether requiring a government issued photo identification burdens the right to vote.  Id. at 189-90; id. at 204 (Scalia, J., concurring).  The lead opinion concluded that the requirement did not impose "excessively burdensome requirements on any class of voters" and that "the statute's broad application to all Indiana voters . . . imposes only a limited burden on voters' rights."  Id. at 202-03 (citations and internal quotation marks omitted).  The concurrence evaluated and upheld a single burden that was

17

uniformly imposed on all voters, without regard to classifications of voters and took issue with the lead opinion's consideration of "class of voters." Id. at 205 (Scalia, J., concurring).

¶37 Given that the burdens imposed were not "severe," both the lead opinion and the concurrence applied rational basis scrutiny in determining that the law was reasonably related to the State's legitimate interests and therefore, upheld the photo identification law. Id. at 204; id. at 209 (Scalia, J. concurring).

¶38 In Wagner, a Wisconsin case affecting voting, we applied the Burdick/Anderson burden analysis to a constitutional challenge to an enforced delay in becoming a candidate. Wagner, 263 Wis. 2d 709, ¶¶1, 76. Judge Wagner claimed a deprivation of "liberty and equal protection of the law" under both the Wisconsin Constitution and the United States Constitution brought about by the enforced delay of his opportunity to be a candidate for a non-judicial office during the judicial term for which he had been elected.[8] Id., ¶76.

¶39 We began by first considering "the character and magnitude of the asserted injury to the rights protected." Id.,

---

[8] We note that Judge Wagner's due process and equal protection claims under the Wisconsin Constitution related to Article I, Section 1 of the Wisconsin Constitution and that plaintiffs' challenge to Act 23 is based on Article III, Section 1 of the Wisconsin Constitution. However, the method of analysis of burdens employed in Wagner v. Milwaukee Cnty. Election Comm'n, 2003 WI 103, 263 Wis. 2d 709, 666 N.W.2d 816, is appropriate here too.

¶77 (quoting Anderson, 460 U.S. at 789). We then considered the "legitimacy and strength" of the State's specifically identified interests, that of maintaining the integrity and independence of the judiciary. Id., ¶83. In so doing, we imported the United States Supreme Court's method of focusing first on the burden placed on a right related to voting and from that determination, deciding what level of judicial scrutiny would be required. After concluding that the burden on the right to become a candidate was not severe, we applied rational basis scrutiny to the challenged limitation and concluded that the State's significant interest supported the delay. Id., ¶¶84-85.

### C. Burdens of Act 23

¶40 We structure our discussion of plaintiffs' challenges to Act 23 consistent with the method of analysis employed in Burdick and Anderson, as we did in Wagner, where the challenge related to when a candidate could be submitted for voters' consideration and how the protections of both the Wisconsin Constitution and the United States Constitution were implicated. Id., ¶76. Accordingly, we first consider whether the burden on

the right to vote is severe.[9]  We begin by examining whether the time and inconvenience of going to DMV offices to secure DOT photo identification cards for voting is a severe burden.  We then consider whether payments for transportation to DMV offices and for documents that DMV has required before it would issue the requested photo identification cards are severe burdens on the exercise of the franchise.  Finally, we consider the precise interests identified by the State for enacting Act 23.

---

[9] In Frank, the district court repeatedly cited to Anderson v. Celebrezze, 460 U.S. 780 (1983) and Burdick v. Takushi, 504 U.S. 428 (1992), but it did not follow the legal standard those cases provide.  Frank, Nos. 11CV1128 and 12CV185, 2014 WL 1775432, at *5.  The district court did not employ the Anderson/Burdick analytic framework because the court did not first determine whether the Wisconsin act severely burdened exercise of the franchise.  Id. at *6.  Rather, the court merely concluded that the act placed an "unjustified" burden on the right to vote.  Id. at *18.  It arrived at its conclusion by first deciding that Walker had failed to prove the significance of the State's interests.  Id. at *6-11.  Because the State's interests were not significant, the district court concluded that the burden was "unjustified."  Id. at *18.

The district court's reasoning stands the Anderson/Burdick analysis on its head.  Anderson and Burdick require that the statutory challenger first prove whether the burden on the franchise is severe because it is this initial determination about the severity of the burden that drives the level of scrutiny courts then apply to the State's asserted interests.  Burdick, 504 U.S. at 434, 440; see also Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 190 (2008); id. at 205 (Scalia, J., concurring).  It is only when a statute imposes a severe burden on the right to vote that the State's asserted interests are subject to strict scrutiny.  Burdick, 504 U.S. at 434.  Accordingly, Frank provides no guidance as we address plaintiffs' claims.

20

### 1.  Time/Inconvenience

¶41 The record provides extensive testimony about trips to DMV offices by individuals who sought to obtain Act 23-acceptable photo identification for voting. Some of these trips were at quite a distance and many trips were repeats because either the line to obtain a photo identification card was too long or the applicant did not have the documents that DMV required in order to issue a photo identification card. Some witnesses testified that they had spent in excess of six hours in their efforts.

¶42 No one who testified thought the process of obtaining a DOT photo identification card was easy. However, all were successful, except two applicants, Ruthelle R. Frank and Ricky T. Lewis. They were unable to obtain photo identification cards because of problems with their birth certificates that may require court action to correct.

¶43 Few cases have parsed the constitutional significance of time and inconvenience burdens on the right to vote. However, Crawford did, to some extent, when it considered the burden that "life's vagaries" can impose and noted that:

> [a] photo identification requirement imposes some burdens on voters that other methods of identification do not share. For example, a voter may lose his photo identification, may have his wallet stolen on the way to the polls, or may not resemble the photo in the identification because he recently grew a beard.

Crawford, 553 U.S. at 197. Crawford also went on to explain that "the inconvenience of making a trip to [a state motor vehicle office], gathering the required documents, and posing

21

for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." Id. at 198. We agree with that assessment.

¶44 Moreover, we note that photo identification is, to some extent, a condition of our times. Many important personal interactions are being modernized to require proof of identity with photo identification. For example, years ago, driver licenses did not require a photograph of the licensee, now Wisconsin driver licenses do. Photo identification is now required to purchase a firearm, to board a commercially operated airline flight, to enter some federal buildings and to obtain food stamps. Photo identification is often required to obtain a book from a public library, to cash a check, to purchase alcoholic beverages, to be admitted to many places of employment and to be seen by one's own physician for a personal appointment. Elector identification is certainly as important an identification as any of the above examples.

¶45 The federal government also has directed states to require photo identification in circumstances where the federal government was not involved in the past. For example, the REAL ID Act of 2005, Pub.L. 109-13, sets forth requirements for state driver licenses wherein underlying documents are required to obtain or renew a driver's license in a state that has implemented the REAL ID Act, as Wisconsin has.[10] See, e.g., Wis.

---

[10] The REAL ID Act also applies to those ID cards for boarding commercially operated airline flights, entering federal

Stat. § 343.165.   As inconvenient as it may be, photo identification is here to stay.   It is a fact of life to which we all have to adjust.

¶46 We do not minimize the difficulties that some who applied for Act 23-acceptable photo identification have encountered in the past or will encounter in the future. However, the time and inconvenience incurred are not severe burdens on the right to vote.   In many cases, these familiar burdens are no more of an imposition than is the exercise of the franchise itself, which can involve waiting in long lines and traveling distances in order to personally cast a ballot on election day.[11]

¶47 In addition, we note that the NAACP and Voces are two of Wisconsin's most conscientious and capable organizations in regard to encouraging and facilitating voting.   They will know what documentation DMV requires to issue DOT photo identification cards for voting and will work to assure that members of the African-American and Latino communities will be well prepared for their trips to DMV.   NAACP and Voces have seen the power that the voting booth can give to their communities

buildings and nuclear power plants.   It does not apply to DOT photo identification cards issued for use in voting.

[11] While our focus is on DOT issued photo identification cards, we note that some of those who testified had obtained a Wisconsin driver's license.   Any payments to Wisconsin government agencies in order to obtain a driver's license are not relevant to our discussion because that license confirms the privilege to drive; it is not obtained solely for elector identification.

23

and will continue to work to assure that all eligible voters have the opportunity to exercise their franchise.

¶48 The Government Accountability Board (GAB) also is poised to assist in educating the electors about how to obtain a DOT-issued photo identification card. The GAB received legislative approval for a $1.9 million appropriation to implement Act 23 and to educate Wisconsin voters on where and how to obtain Act 23-acceptable photo identification. Although some of these efforts have been put on hold due to circuit court injunctions, the GAB remains a significant resource for information and education.

## 2. Costs

¶49 We now turn to the other burden that the plaintiffs identified and the circuit court found, which are the costs incurred in obtaining a DOT-issued photo identification card for voting. Some costs involved payments for transportation to DMV offices or time taken from work. They are not costs paid to a government agency nor are they regulated by Act 23. In some respects, they are similar to those costs incurred in casting an in-person ballot. They are not a severe burden on the right to vote.

¶50 Plaintiffs also provided evidence of payments to government agencies to obtain documents required by DMV to issue DOT photo identification cards to vote. Plaintiffs do not employ the term "poll tax" in regard to those payments and we do not define them as poll taxes. Plaintiffs assert, however, that those payments are an unconstitutional burden on the right to

24

vote. Because other jurisdictions have characterized payments to government agencies to obtain documents necessary to voting as a de facto poll tax and because there are compelling reasons to assure that Wisconsin does not impose an unconstitutional fee as a condition of voting, we interpret Act 23 with both characterizations in mind.

¶51 Act 23 provides that DOT "may not charge a fee to an applicant for the initial issuance, renewal, or reinstatement of an identification card" when "the applicant requests that the identification card be provided without charge for purposes of voting." Wis. Stat. § 343.50(5)(a)3. This provision prohibits DOT from causing any elector, rich or poor, to pay a fee as a condition to voting.

¶52 However, plaintiffs incurred costs due to payments to government agencies for documents that DMV required in order to issue DOT photo identification cards for voting. These costs were not paid to DOT or its division, DMV; they were paid to other government agencies. One example of such a cost is the payment for certified copies of birth certificates that DMV has required as proof of name, date of birth and citizenship.[12] See Wis. Stat. § 69.22.

¶53 Payments required to be made to a Virginia government agency in order to exercise the right to vote were held unconstitutional in Harper, where a $1.50 poll tax was examined.

---

[12] Copies of other vital records, Wis. Stat. § 69.21, may also have been required. For convenience of discussion, we refer only to birth certificates.

25

The Supreme Court concluded that "payment of any fee" to a Virginia government entity could not be required as a condition of voting. Harper, 383 U.S. at 666. Although the Court talked about the uneven impact such a fee may have on those with limited financial resources, the Court struck down the fee for all voters. Id.

¶54 More recently, state supreme courts have examined claims that fees paid to state agencies to obtain documents required as part of the application process for state photo identification cards violated electors' constitutional rights. For example, in In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71, 740 N.W.2d 444 (Mich. 2007), the Michigan Supreme Court considered a facial challenge to a Michigan statute that required potential voters to identify themselves with a government-issued photo identification card. Id. at 451. As part of its discussion, the court examined whether ancillary charges for documents necessary to obtaining the required photo identification card operated as a de facto poll tax that violated the Michigan Constitution or United States Constitution. Id. at 463-66.

¶55 In concluding that the Michigan statute was not a de facto poll tax, the court explained:

> [T]he statute does not condition the right to vote on the payment of any fee. A voter who does not otherwise possess adequate photo identification is not required to incur the costs of obtaining photo identification as a condition of voting. Instead, a voter may simply sign an affidavit in the presence of an election inspector. Nothing in the statute

26

contemplates that a voter is required to incur any costs in the execution of an affidavit.

Id. at 464-65.   Therefore, the Michigan statute differed from the Wisconsin law because Act 23 requires elector identification by presenting a government-issued photo identification and does not permit an elector to vote after signing an affidavit of identity at the polls.[13]

¶56  In City of Memphis v. Hargett, 414 S.W.3d 88 (Tenn. 2013), the Tennessee Supreme Court considered a Tennessee statute that required, with limited exceptions, electors to provide photographic proof of identity.  Id. at 92.  Under the Tennessee law, an elector who attempted to vote in person, but was unable to produce valid evidence of identification and did not fall within the exceptions to the law, may cast a provisional ballot, which would be counted if the voter presented valid proof of identity within two days after the election.  Id. at 93.

---

[13] The affidavit alternative available to Michigan electors provides:

> If the elector does not have an official state identification card, operator's or chauffeur's license as required in this subsection, or other generally recognized picture identification card, the individual shall sign an affidavit to that effect before an election inspector and be allowed to vote as otherwise provided in this act.

In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71, 740 N.W.2d 444, 451 (Mich. 2007) (quoting Mich. Comp. Laws § 168.523).

¶57 Two voters presented non-compliant photo identifications issued by the City of Memphis and cast provisional ballots when their identifications were not accepted. Id. at 93-94. Those voters and the City then challenged the statute, bringing both facial and as-applied constitutional challenges. Id. at 94-95. In upholding the constitutionality of the Tennessee statute against the challenges, part of which contended that the law amounted to a de facto poll tax, the court pointed out that:

> [T]his state's Act contains an exception for any in-person voter who "is indigent and unable to obtain proof of identification without payment of a fee[.]" By its plain language, this provision exempts from the photo ID requirement any voter unable to pay the fees needed to obtain valid evidence of identification, including any fee associated with the documentation necessary to obtain a "free" photo ID card pursuant to section 55-50-336(g)(1). Because of this provision, we cannot endorse the Plaintiffs' characterization of the photo ID requirement as a poll tax.

Id. at 106 (emphasis added) (citation omitted). There, indigency operated as an exception to payment of direct and ancillary fees while preserving the right to vote.

¶58 In Crawford, the United States Supreme Court also mentioned ancillary fees. It noted that, "Indiana, like most States, charges a fee for obtaining a copy of one's birth certificate. This fee varies by county and is currently between $3 and $12." Crawford, 553 U.S. at 198 n.17. However, the Court did not consider whether an ancillary payment to an Indiana government agency in order to obtain a birth certificate was a de facto poll tax because "the record does not provide

28

even a rough estimate of how many indigent voters lack copies of their birth certificates." Id. at 202 n.20. Additionally, indigent electors could avoid paying that fee by casting a provisional ballot and then executing an affidavit before the circuit court clerk within ten days of the election. Id. at 186.

¶59 The voter identification laws of Michigan, Tennessee and Indiana all included a provision by which a voter could cast a ballot without paying money to a government agency. Act 23 similarly provides that DOT "may not charge a fee to an applicant for the initial issuance, renewal, or reinstatement of an identification card" when "the applicant requests that the identification card be provided without charge for purposes of voting." Wis. Stat. § 343.50(5)(a)3.

¶60 Requiring payment to a government agency to obtain a DOT photo identification card for voting puts the administrative regulation on a collision course with Act 23's directive that DOT "may not charge a fee." It also would be a severe burden on the right to vote.

¶61 Why is this burden severe? The usual payment of $20 for a certified copy of a birth certificate is modest and does not approach the sizeable costs parsed in other cases that bear on voting. See Lubin v. Panish, 415 U.S. 709, 710, 719 (1974) (concluding that $701.60 filing fee was unconstitutional); see also Bullock v. Carter, 405 U.S. 134, 145, 149 (1972) (explaining that a primary filing fee that at times reached $8,900 was constitutionally impermissible).

29

¶62 The modest fees for documents necessary to prove identity would be a severe burden on the constitutional right to vote not because they would be difficult for some to pay. Rather, they would be a severe burden because the State of Wisconsin may not enact a law that requires any elector, rich or poor, to pay a fee of any amount to a government agency as a precondition to the elector's exercising his or her constitutional right to vote.  See Harper, 383 U.S. at 666 (concluding that the "payment of any fee [may not be] an electoral standard").[14]

¶63 Given our conclusion that it would be contrary to Act 23 and a severe burden on the right to vote if an elector were obligated to pay a fee to a government agency in order to obtain documents required for a DOT photo identification card to vote, we now consider whether a saving construction that is consistent with the statutory mandate and the Wisconsin constitution is possible.[15]  If a saving construction of the administrative rule

---

[14] Although Harper was based on the United States Constitution, Wisconsin's protection of the right to vote is even stronger because in addition to the equal protection and due process protections of Article I, Section 1 of the Wisconsin Constitution, the franchise for Wisconsin voters is expressly declared in Article III, Section 1 of the Wisconsin Constitution.

[15] We have broad subject matter jurisdiction as a "court of last resort on all judicial questions under the constitution and laws of the state; a court of first resort on all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people."  Attorney Gen. v. Chicago & Nw. Ry. Co., 35 Wis. 425, 518 (1874).

preserves the constitutionality of the statute, we will employ it.  See McConnell v. Fed. Election Comm'n, 540 U.S. 93, 180 (2003) (concluding that where a saving construction is "fairly possible," the court will adopt it) (quoting Crowell v. Benson, 285 U.S. 22, 62 (1932)).

¶64  We do so in order to avoid a constitutional conflict. See, e.g., Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 503 (2001) (avoiding an interpretation of Fed. R. Civ. Pro. 41(b) that "would arguably violate the jurisdictional limitation of the Rules Enabling Act").  Stated otherwise, when we determine that there is a statutory flaw that may have constitutional significance, we ascertain whether the government rule or statute can be interpreted in a manner that will avoid a constitutional conflict.  See State ex rel. Strykowski v. Wilkie, 81 Wis. 2d 491, 506, 261 N.W.2d 434 (1978).  As the Supreme Court has explained, it is best to "limit the solution to the problem" rather than enjoining the application of an entire statute due to a limited flaw.  Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328-29 (2006).

---

It is true that courts may lack subject matter jurisdiction to review administrative agency decisions if the petition for review is not timely filed.  Schiller v. DILHR, 103 Wis. 2d 353, 355, 309 N.W.2d 5 (Ct. App. 1981) (concluding that circuit court lacked subject matter jurisdiction to review LIRC decision because petition was not timely filed); Kegonsa Joint Sanitary Dist. v. City of Stoughton, 87 Wis. 2d 131, 150, 274 N.W.2d 598 (1979) (same).  However, this line of cases has nothing to do with the issues presented in this appeal.

¶65 Here, the potential to impose a severe burden on the right to vote is not stated in Act 23 itself. Rather, the flaw is in the administrative rules that DMV has applied to applicants for DOT photo identification cards to vote. Accordingly, we do not initially weigh the burden identified, i.e., the fees paid to government agencies to obtain documents that DMV has required prior to issuing DOT photo identification cards for voting, because a saving construction of the administrative rule must be considered first.

### 3. Saving construction

¶66 Wisconsin statutes and administrative regulations that address the same subject matter must be construed in a way that harmonizes them. Cnty. of Milwaukee v. Superior of Wisconsin, Inc., 2000 WI App 75, ¶21, 234 Wis. 2d 218, 610 N.W.2d 484. Here, Wis. Admin. Code § Trans 102.15(3)(a) requires documents for "Proof of Name and Date of Birth," that other statutes, such as Wis. Stat. § 69.22, require payment to provide. This creates a conflict with Act 23's directive to provide DOT photo identification cards for voting without charge.

¶67 However, DMV administrators have discretion under Wis. Admin. Code § Trans 102.15(3)(b) to excuse the failure to provide documents referenced in § Trans 102.15(3)(a) when DOT photo identification cards for voting are requested. Section Trans 102.15(3)(b) and (c) provide:

> (b) If a person is unable to provide documentation under [§ Trans 102.15(3)](a), and the documents are unavailable to the person, the person may make a written petition to the administrator of

the division of motor vehicles for an exception to the requirements of par. (a). The application shall include supporting documentation required by sub. (4) and:

    1. A certification of the person's name, date of birth and current residence street address on the department's form;

    2. An explanation of the circumstances by which the person is unable to provide any of the documents described in par. (a); and

    3. Whatever documentation is available which states the person's name and date of birth.

    (c) The administrator may delegate to the administrator's subordinates the authority to accept or reject such extraordinary proof of name and date of birth.

¶68 Because the exercise of a DMV administrator's discretion has constitutional ramifications when a DOT photo identification card for voting is requested, we note that we are obliged to choose the interpretation of Wis. Admin. Code § Trans 102.15(3)(b) that does not conflict with the Wisconsin Constitution. See Am. Family, 222 Wis. 2d at 667.

¶69 In order to harmonize the directive of Wis. Stat. § 343.50(5)(a)3., which says no fees; statutes such as Wis. Stat. § 69.22, which impose payment of fees; and Wis. Admin. Code § Trans 102.15(3)(a), which requires certain documents for which electors may be required to pay fees to government agencies, we construe § Trans 102.15(3)(b). We do so to preserve the constitutionality of § 343.50(5), as follows: One who petitions an administrator pursuant to § Trans 102.15(3)(b) for an exception is constitutionally "unable" to provide those

documents and they are constitutionally "unavailable" to the petitioner within our interpretation of § Trans 102.13(3)(b), so long as petitioner does not have the documents and would be required to pay a government agency to obtain them.[16]

¶70 Stated otherwise, to invoke an administrator's discretion in the issuance of a DOT photo identification card to vote, an elector: (1) makes a written petition to a DMV administrator as directed by Wis. Admin. Code § Trans 102.15(3)(b) set forth above; (2) asserts he or she is "unable" to provide documents required by § Trans 102.15(3)(a) without paying a fee to a government agency to obtain them; (3) asserts those documents are "unavailable" without the payment of such a fee; and (4) asks for an exception to the provision of § Trans 102.15(3)(a) documents whereby proof of name and date of birth that have been provided are accepted. § Trans 102.15(3)(b) and (c). Upon receipt of a petition for an exception, the administrator, or his or her designee, shall exercise his or her discretion in a constitutionally sufficient manner.[17]

¶71 We further conclude that filing a Wis. Admin. Code § Trans 102.15(3)(b) petition for an exception with a DMV

---

[16] Our ruling in this regard applies to the provision of an elector's initial, renewal and reinstatement of a DOT photo identification card. It does not apply to replacements for DOT photo identification cards that have been lost or misplaced.

[17] We do not address the straw man of personal jurisdiction because it is not the DMV administrator's rights that are at issue in this lawsuit. It is the electors' constitutional right to vote.

administrator, as set forth above, is not a severe burden on the right to vote. Accordingly, because the burdens of time, inconvenience and costs upon electors' right to vote are not severe under our interpretation of § Trans 102.15, we apply a rational basis level of scrutiny in determining whether Act 23 is constitutional. Mary F.-R., 351 Wis. 2d 273, ¶35; Wagner, 263 Wis. 2d 709, ¶84. As the Supreme Court has explained, it is erroneous to assume that a law that regulates voting must be subject to strict scrutiny. Burdick, 504 U.S. at 432. Strict scrutiny applies only when a statute imposes a severe burden on the exercise of the franchise. Id. at 434.

### D. State Interests

¶72 Defendants have identified state interests of protecting the integrity and reliability of the electoral process, maintaining public confidence in election results and preventing voter fraud as significant and compelling interests that underlie Act 23.

¶73 It should be beyond question that the State has a significant and compelling interest in protecting the integrity and reliability of the electoral process, as well as promoting the public's confidence in elections. Crawford, 553 U.S. at 196. As we learn of elections that are currently occurring around the world in troubled nations, the integrity and

reliability of the electoral process and the public's confidence in elections are always exceedingly important.[18]

¶74 The circuit court found there was no evidence of "recent" voter impersonation fraud in Wisconsin. However, that finding cannot overcome the State's interest in preventing voter fraud.[19] As the Supreme Court has held, "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006).

¶75 We agree that the identified interests are significant and compelling. Id. (explaining that the "State indisputably has a compelling interest in preserving the integrity of its election process" (quoting Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 231 (1989) and that "[c]onfidence in the integrity of our electoral process is essential to the functioning of our participatory democracy"). However, because the burden on exercise of the franchise is not severe, the defendants need show only a legitimate state interest and that

---

[18] A recent filing in Milwaukee County demonstrates that voter fraud is a concern. See State v. Monroe, 2014CF2625 (June 20, 2014), wherein the Milwaukee County District Attorney's office filed a criminal complaint against Robert Monroe that alleged 13 counts of voter fraud, including multiple voting in elections and providing false information to election officials in order to vote.

[19] We note that Wisconsin was one of the states identified in Crawford, where there is a record of voter fraud having occurred. Crawford, 553 U.S. at 195 n.12.

requiring elector identification by the use of a government-issued photo identification is a reasonable means of serving that interest.  See Wagner, 263 Wis. 2d 709, ¶¶77-78; Crawford, 553 U.S. at 196-97; 553 U.S. at 208 (Scalia, J., concurring); Burdick, 504 U.S. at 440.

¶76 We conclude that the use of Act 23-acceptable photo identification is a reasonable means of furthering the stated interests.  It may help to assure the public that the electoral process is followed and that results of elections held in Wisconsin validly represent the will of the electors.  In addition, those who would attempt to defraud the electors through misrepresentations to election officials will find that task more difficult.

### III.  CONCLUSION

¶77 We conclude that the burdens of time and inconvenience associated with obtaining Act 23-acceptable photo identification are not severe burdens on the right to vote and do not invalidate the law.  The burdens of time and inconvenience of obtaining Act 23-acceptable photo identification are in many respects no more of an imposition than is casting an in-person ballot on election day.  Furthermore, photo identification is a condition of our times where more and more personal interactions are being modernized to require proof of identity with a specified type of photo identification before proceeding.

¶78 However, to require payments to government agencies for documents necessary to obtain DOT photo identification cards for voting would severely burden the right to vote because it

would condition that right on payment to a government agency. Act 23 explicitly prohibits payment to a government agency to obtain a DOT photo identification card for voting.

¶79 The payments at issue arise under Wisconsin administrative rules that implement Act 23. Therefore, we construed those rules and explained how the discretion of the DMV administrator must be exercised in a constitutionally sufficient manner. Such exercise of discretion requires the issuance of DOT photo identification cards for voting without requiring documents for which a fee continues to be charged by a government agency. In so doing, we employ a saving construction of Wis. Admin. Code § Trans 102.15(3)(b) and relieve the severe burden that would otherwise exist due to costs levied by government agencies.

¶80 Because Act 23 does not place a severe burden on the exercise of the franchise, we apply rational basis scrutiny and conclude that Act 23 is reasonably related to the State's significant interests. Accordingly, we reverse the judgment of the circuit court and vacate all injunctions the court issued.

*By the Court*-The judgment of the circuit court is reversed and the permanent and temporary injunctions are vacated.

¶81 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* I have written in dissent in <u>League of Women Voters v. Walker</u>, 2014 WI 97, ___ Wis. 2d ___, ___ N.W.2d ___. That dissent also applies to the instant case. Indeed I incorporate my entire dissent in <u>League of Women Voters</u> in this dissent. The instant case, like <u>League of Women Voters</u>, is a facial challenge to Act 23, although it presents a richer factual record than does <u>League of Women Voters</u>.

¶82 Like the majority opinion[1] and Justice Crooks' dissent,[2] I agree that Act 23 creates a severe burden on the exercise of the right to vote. I join the reasoning set forth in Justice Crooks' dissent concerning the substantial burden placed on the right of qualified voters to vote; the failure of the State to advance a compelling state interest; and the failure of the majority opinion in <u>NAACP</u> to remedy the burdens it identifies.[3] In particular, I agree with Justice Crooks' dissent that the record in the instant case demonstrates that a substantial number of constitutionally qualified registered

---

[1] Majority op., ¶7 (noting that the statute creates a "severe burden on the right to vote").

[2] <u>See</u> Justice Crooks' dissent, ¶92.

[3] <u>See also</u> <u>Frank v. Walker</u>, No. 11-CV-01128, 2014 WL 1775432 (E.D. Wis. Apr. 29, 2014). Although the instant case provides a slightly different record and the challenge in the instant case is raised under the Wisconsin Constitution, not the United States Constitution, the <u>Frank</u> court's reasoning that Act 23 imposes burdens on the right to vote and that the State failed to meet the requirements of the test laid out in <u>Burdick v. Takushi</u>, 504 U.S. 428 (1992), and <u>Anderson v. Celebrezze</u>, 460 U.S. 780 (1983), is instructive.

voters in Wisconsin do not possess the required government-issued identification[4] and that the costs of obtaining such identification constitute a severe burden.[5]

¶83  I write separately, however, because as I wrote in my dissent in League of Women Voters, the NAACP opinion is confused and confusing regarding the standard of review.[6]  Moreover, Wisconsin case law sets forth a stringent standard of review for voting rights cases applicable to both League of Women Voters and the instant case under the Wisconsin Constitution.  The League of Women Voters case and the instant case ignore Wisconsin's jurisprudence regarding review of legislation regulating voting rights.

¶84 Nevertheless, whether I apply the Burdick/Anderson standard of review or any variation thereof or the standard in Wisconsin's case law regarding review of legislation regulating voting rights, I conclude that Act 23 is unconstitutional.  The State "may not burden the right to vote merely by invoking abstract interests, be they legitimate, or even compelling, but must make a particular, factual showing that threats to its interests outweigh the particular impediments it has imposed. The State has made no such justification here, and as to some aspects of its law, it has hardly even tried."[7]

---

[4] See Justice Crooks' dissent, ¶¶114-118.

[5] See Justice Crooks' dissent, ¶¶119-134.

[6] See League of Women Voters v. Walker, 2014 WI 97, ¶¶112-136 (Abrahamson, C.J., dissenting).

[7] Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 209 (2008) (Souter, J., dissenting) (citation omitted).

¶85 Like Justice Crooks' dissent, I would hold that invalidating Act 23 is the only appropriate remedy. This court should not rule on administrative regulations not before us or rewrite a statute. For the foregoing reasons, I dissent.

¶86 N. PATRICK CROOKS, J. *(dissenting).* The question of whether Act 23 violates the Wisconsin Constitution is at the intersection of profound democratic principles: the right of qualified Wisconsin citizens to vote, as explicitly guaranteed by the Wisconsin Constitution,[1] and the undisputed principle that the state has a legitimate interest in safeguarding the integrity of elections through regulations.[2] Voter identification provisions are one way the state may choose to protect the legitimacy of elections. Such provisions may be constitutionally imposed even if they severely burden a person's right to vote as long as they are narrowly tailored to advance a compelling state interest. However, Act 23's photo identification requirements severely burden eligible voters without being narrowly tailored to achieve the state's compelling interests of reducing voter fraud and increasing

---

[1] The Wisconsin Constitution guarantees the right to vote to qualified citizens. It states, "Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." Wis. Const. art. III, § 1.

[2] Dells v. Kennedy and Others, 49 Wis. 555, 557, 6 N.W. 246 (1880) ("For the orderly exercise of the right [to vote] . . . it is admitted that the legislature must prescribe necessary regulations as to the places, mode and manner, and whatever else may be required to insure its full and free exercise."); State ex rel. Wood v. Baker (Baker), 38 Wis. 71, 86 (1875) ("Statutes cannot impair the right [to vote], though they may regulate its exercise. Every statute regulating it must be consistent with the constitutionally qualified voter's right of suffrage when he claims his right at an election. Then statutes may require proof of the right, consistent with the right itself.").

1

voter confidence in the outcomes of elections.[3] For that reason, Act 23 is an unconstitutional election regulation, and I therefore respectfully dissent.

¶87 The United States Supreme Court's decision in Crawford v. Marion County Election Board,[4] which upheld Indiana's voter identification statute, does not persuade me that Act 23 is constitutional. This is because there are substantial differences between this case and the Crawford case. First, the record in the Crawford case was not nearly as developed as the record in this case. This factor certainly influenced the Supreme Court's decision.[5] Second, Indiana's voter identification statute is not as stringent as Act 23. Most importantly, the Indiana law provides for an affidavit exception that allows certain individuals to vote without photo identification.[6] In upholding Indiana's voter identification law, Justice Stevens' lead opinion commented that the severity of the burden imposed by the photo identification requirement

---

[3] The balancing test under which I find Act 23 unconstitutional is addressed in Anderson v. Celebrezze, 460 U.S. 780, 789 (1983), and further discussed by Burdick v. Takushi, 504 U.S. 428, 434 (1992).

[4] Crawford v. Marion Cnty. Election Bd., 553 U.S. 181 (2008).

[5] Id. at 200 ("But on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters . . . . [T]he record does not provide us with the number of registered voters without photo identification.").

[6] Id. at 186 (describing the affidavit procedure available to indigent voters as well as individuals with a religious objection to being photographed).

2

"is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted."[7] Finally, while Act 23 applies to both in-person and absentee voting, Indiana's photo identification requirements do not apply to absentee voting. Therefore, the Crawford case is neither controlling nor persuasive.

¶88 The majority opinion claims to approach the plaintiffs' constitutional challenge to Act 23 as a purely facial challenge.[8] In doing so it purports to evaluate Act 23 using the framework outlined by the United States Supreme Court in Anderson v. Celebrezze, 460 U.S. 780 (1983), and Burdick v. Takushi, 504 U.S. 428 (1992). However, it ultimately turns to a different legal theory to conclude that Act 23 imposes an unconstitutional de facto poll tax[9] on voters, which imposes a severe burden.[10] The de facto poll tax to which it refers is not the cost of the identification card itself, which is available free of charge, but the cost of obtaining a birth certificate, which a voter is required to have to obtain an identification

---

[7] Id. at 199.

[8] Majority op., ¶¶19, 21.

[9] Although the majority sometimes asserts that it does not define the payments at issue as poll taxes, it acknowledges that it interprets Act 23 with this "characterization[] in mind." Id., ¶50. Regardless of what the majority calls the costs at issue, it is clear that the majority relies on poll tax jurisprudence.

[10] Id., ¶¶62-63 (citing Harper v. Va. Bd. of Elections, 383 U.S. 663, 666 (1966)).

3

card for voting.[11] After concluding that the costs of obtaining a birth certificate impose an unconstitutional de facto poll tax that severely burdens eligible Wisconsin voters, the majority then crafts a remedy which allows individuals to obtain certified copies of their birth certificates free of charge.[12] The majority concludes that its remedy lessens the burden imposed by Act 23 on eligible Wisconsin voters to such a degree that Act 23 easily passes constitutional muster.[13]

¶89 I cannot agree with the majority opinion's characterization and analysis of the plaintiffs' challenge. The majority incorrectly characterizes the challenge as a purely facial challenge. It fails to apply the Anderson/Burdick framework correctly. It improperly relies on poll tax case law. Even if I were to assume that poll tax analysis applied, the majority's attempt to alleviate the de facto poll tax for eligible Wisconsin voters results in an unworkable solution that fails to cure the unconstitutionality of Act 23. Specifically, the majority opinion's remedy appears to leave in place the discretion of DMV administrators to issue or refuse to issue Act 23-compliant identification where a fee is required for supporting documents. If the majority opinion leaves in place

---

[11] See id., ¶63. The majority states, "Copies of other vital records, Wis. Stat. § 69.21, may also have been required. For convenience of discussion, we refer only to birth certificates." See majority op., ¶52 n.12. I employ the same term.

[12] See id., ¶¶7 n.5, 70.

[13] See id., ¶¶79-80.

4

the discretion of DMV administrators to issue exceptions to those burdened by the cost of obtaining underlying documentation,[14] then it fails to guarantee constitutional protections against poll taxes. On the other hand, if the majority opinion <u>requires</u> DMV administrators to issue photo identification cards to individuals who are burdened by the cost of obtaining required underlying documentation,[15] it is directing a non-party to take specific action, which it has no authority to do. In sum, the remedy imposed by the majority, under either approach, is flawed. It impinges on the legislature's role by interpreting administrative code provisions that are not part of this challenge and by directing an administrative agency that is not a party to this case. I urge the legislature to take action to cure the unconstitutionality of Act 23. Without such action, the remedy crafted by the majority leaves Act 23 unconstitutional.

¶90 The appropriate framework to analyze the plaintiffs' challenge to Act 23 is the modified facial challenge approach, which the United States Supreme Court has applied[16] in comparable

---

[14] <u>See</u> <u>id.</u>, ¶70.

[15] <u>See</u> <u>id.</u>, ¶7, ¶7 n.5.

[16] <u>See</u> <u>Citizens United v. Fed. Election Comm'n</u>, 558 U.S. 310, 333-35 (2010) (applying a modified facial challenge approach and concluding, in part, that independent corporate political expenditures cannot be limited under the First Amendment); <u>see also</u> <u>Wash. State Grange v. Wash. State Republican Party</u>, 552 U.S. 442, 449 n.6 (2008) (applying a modified facial challenge approach and holding that Washington State's primary system did not violate political parties' associational rights under the First Amendment).

5

cases. Under a modified facial challenge, a "law may be overturned as impermissibly overbroad because a '<u>substantial number</u>' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'"[17] This differs from a purely facial challenge, which necessarily fails if any application of the challenged law is constitutional.

¶91 A modified facial challenge is appropriate in this type of case because neither a purely facial challenge nor an as-applied challenge is practical in these circumstances. A purely facial challenge requires that a party prove that a law is unconstitutional under all circumstances.[18] Based on the burden that it imposes, a purely facial challenge to Act 23 fails without question because the photo identification requirements of the law could be constitutionally applied to any Wisconsin voter who already possesses the appropriate identification. In contrast to a purely facial challenge, an as-applied challenge looks at whether a law violated the constitutional rights of a particular person under the facts presented.[19] Here, the record developed before the circuit court established that a substantial number of eligible Wisconsin voters lack Act 23-compliant identification and are severely burdened by its requirements. A requirement that each burdened

---

[17] <u>Wash. State Grange</u>, 552 U.S. at 449 n.6 (emphasis added) (quoting <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 615 (1973)).

[18] <u>State v. Wood</u>, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63.

[19] <u>Id.</u>

individual bring an as-applied challenge would perpetuate uncertainty about the constitutionality of Act 23, as well as result in an extreme volume of litigation that would take a significant amount of time and resources to conclude. Since the purely facial and as-applied frameworks cannot appropriately address the constitutionality of Act 23, I would apply a modified facial approach as utilized by the United States Supreme Court in analogous situations discussed in more detail herein.

¶92 Under a proper application of the Anderson/Burdick framework, a modified facial challenge to Act 23's constitutionality succeeds in establishing a violation of the Wisconsin Constitution. The only proper remedy is invalidation of the law. This is because Act 23 imposes severe burdens on a substantial number of eligible Wisconsin voters who do not currently possess an Act 23-compliant form of identification, and that burden cannot be remedied by this court. First, and most importantly, even though the identification card itself can be obtained at no cost, there are costs associated with acquiring the underlying documents required to obtain an identification card. Those costs impose a severe burden on certain eligible Wisconsin voters, both those born in Wisconsin and those born in other states and other countries. Second, for certain voters the time and effort required to obtain Act 23-compliant identification adds to the severity of the burden.

¶93 The majority recognizes that a severe cost burden exists, but instead of considering such burden in a

7

straightforward manner under the well-established _Anderson/Burdick_ framework, it applies poll tax analysis and crafts a remedy that purports to alleviate the burden imposed by Act 23. The majority concludes that the costs associated with obtaining a free voter identification card are the functional equivalent of an unconstitutional poll tax. No party or amicus brief advanced this argument. Instead all recognized the _Anderson/Burdick_ test as the applicable framework. That test requires that a heightened level of scrutiny apply to any voting regulation that imposes a severe burden.[20] I conclude that Act 23 imposes such a burden on a substantial number of eligible Wisconsin voters. This means Act 23 must be narrowly tailored to achieve compelling governmental interests if it is to be upheld. I conclude that Act 23 does not meet this standard.

¶94 In contrast to my approach, the majority opinion makes a radical departure from the well-established _Anderson/Burdick_ framework. This is because instead of balancing the benefits and burdens of Act 23 as the _Anderson/Burdick_ framework instructs and reaching the conclusion compelled by the record, the majority intervenes to lessen the severity of the burden by crafting a remedy that allows for individuals to obtain a certified copy of their birth certificate, a document necessary to obtain a free voter identification card, free of charge. Furthermore, the majority opinion's remedy reworks the framework in which Act 23 operates, which is not the court's role. It is

---

[20] _Burdick_, 504 U.S. at 434 (citing _Anderson_, 460 U.S. at 788).

the legislature and not this court that must craft a constitutional voter identification law considering the framework in which that law operates, policy objectives, and budgetary constraints. For these reasons, I respectfully dissent.

## I. THE MODIFIED FACIAL CHALLENGE APPROACH

¶95 The majority opinion asserts that it is addressing a purely facial challenge to Act 23.[21] The majority's analysis, however, reveals that it is not actually doing so. We have consistently said that a purely facial challenge to a law may succeed only when the challenger proves that the law cannot be constitutionally applied under any circumstance.[22] Because Act 23 imposes a minimal burden on eligible Wisconsin voters who already possess an approved form of identification, the law would survive a purely facial challenge on that basis alone. However, the challenge before this court is not purely facial. Instead, it is better understood and analyzed as a modified facial challenge.

¶96 In certain contexts, the United States Supreme Court has recognized the existence of a modified approach to facial challenges.[23] "Our cases recognize a second type of facial

---

[21] Majority op., ¶¶19, 21.

[22] Wood, 323 Wis. 2d 321, ¶13. United States v. Salerno, 481 U.S. 739 (1987), first established this approach to the evaluation of a purely facial constitutional challenge.

[23] See Wash. State Grange, 552 U.S. at 449 n.6 (discussing First Amendment overbreadth doctrine); see also Sabri v. United States, 541 U.S. 600, 609-10 (2004) (listing cases in which the United States Supreme court applied a modified or relaxed facial analysis).

9

challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'"[24]

¶97 The United States Supreme Court used this type of analysis in Citizens United v. Federal Election Commission, 558 U.S. 310, 333-35 (2010). There, the Court reasoned, "In the exercise of its judicial responsibility, it is necessary then for the Court to consider the facial validity of § 441b. Any other course of decision would prolong the substantial, nationwide chilling effect caused by § 441b's prohibitions on corporate expenditures."[25] Essential to the Court's reasoning was that requiring plaintiffs to bring as-applied challenges to the law would cause uncertainty and prolonged litigation, which would not be appropriate considering the importance of speech in the context of elections.[26]

¶98 A discussion of purely facial constitutional challenges and as-applied constitutional challenges demonstrates why the modified facial approach is appropriate in this case. A purely facial challenge requires that the party challenging the law prove, beyond a reasonable doubt, that the law is unconstitutional under all circumstances.[27] "If a challenger

---

[24] Wash. State Grange, 552 U.S. at 449 n.6 (quoting Broadrick, 413 U.S. at 615).

[25] Citizens United, 558 U.S. at 333.

[26] Id. at 333-35.

[27] Wood, 323 Wis. 2d 321, ¶¶13, 15.

10

succeeds in a facial attack on a law, the law is void 'from its beginning to the end.'"[28]  Furthermore, in considering a purely facial constitutional challenge, we presume that the law is constitutional.[29]

¶99 An as-applied challenge, in contrast, determines whether a law violated the constitutional rights of a particular person under the facts presented.[30]  "Under such a challenge, the challenger must show that his or her constitutional rights were actually violated. If a challenger successfully shows that such a violation occurred, the operation of the law is void as to the party asserting the claim."[31]  Therefore, in an as-applied challenge, a court should not presume that the statute has been applied in a constitutional manner.[32]

---

[28] Id., ¶13 (quoting State ex rel. Comm'rs of Pub. Lands v. Anderson, 56 Wis. 2d 666, 672, 203 N.W.2d 84 (1973)).

[29] See id., ¶15.

[30] Id., ¶13.

[31] Id.

[32] This statement is supported by Tammy W-G. v. Jacob T., 2011 WI 30, ¶49, 333 Wis. 2d 273, 797 N.W.2d 854, in which we stated, "[T]he analysis that is employed for an as-applied challenge contains no presumption in regard to whether the statute was applied in a constitutionally sufficient manner." Similarly, we have explained that "[w]hile we presume a statute is constitutional, we do not presume that the State applies statutes in a constitutional manner."  Soc'y Ins. v. Labor & Indus. Review Comm'n, 2010 WI 68, ¶27, 326 Wis. 2d 444, 786 N.W.2d 385.

¶100 The majority opinion's claim that it is treating this challenge as a purely facial challenge upsets the well-drawn distinction between purely facial and as-applied challenges. Treating this as a purely facial challenge is not appropriate because the plaintiffs do not actually allege that Act 23 is unconstitutional under all applications. They acknowledge that the photo identification requirements of the law could be constitutionally applied to any eligible Wisconsin voter who already possesses Act 23-compliant identification.[33] Instead of making a purely facial challenge, the plaintiffs argue that Act 23 presents a severe burden on a substantial number of eligible voters.

¶101 Similarly, because the challenge here alleges a potential burden to hundreds of thousands of eligible voters,[34]

---

In the context of the modified facial challenge approach, some scholars have suggested the presumption of constitutionality that applies to purely facial challenges has no application to the First Amendment overbreadth doctrine. Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev. 235, 261-283 (1994) ("Thus, when the court considers the overbreadth challenge, applying the Salerno presumption entails judging the litigant by an unconstitutional rule of law——unconstitutional because, at least for the time being, it chills the behavior of third parties.").

[33] The circuit court found that "[t]he majority of Wisconsin voters, some 80%, possess a driver's license that meets the Photo ID requirements of Act 23." This means that Act 23 operates constitutionally in regard to the approximately 80% of Wisconsin voters who face little or no burden in complying with the law's identification requirements.

[34] The circuit court found that approximately 333,276 eligible voters in Wisconsin lack identification that would comply with Act 23.

12

it is inappropriate to require that each affected individual bring an as-applied challenge. While the exact number of individuals without identification who would be substantially burdened or unable to obtain identification is not established, requiring an as-applied approach would mean that each burdened individual or group of individuals would have to challenge Act 23 separately. This would lead to an unnecessarily large volume of litigation that would take a substantial amount of time and resources to conclude. Requiring that individuals bring as-applied challenges would perpetuate uncertainty about the application of the law to different groups and could strip individuals with unresolved but meritorious cases of the right to vote at election time.

¶102 This court should look to the United States Supreme Court's modified facial challenge approach, which stems from the First Amendment overbreadth doctrine because it fits equally well in the election regulation context. As I have previously discussed, this approach makes sense because of the problems associated with treating the plaintiffs' challenge to Act 23 as either a purely facial challenge or as an as-applied challenge.

¶103 In addition to these practical reasons, a modified facial challenge approach to laws that allegedly burden the right to vote is justified because of the importance of the right as well as the Anderson/Burdick framework in which voting regulations are analyzed.[35] When a voting regulation is

---

[35] See Dorf, supra note 32, at 264-68 (discussing the potential application of the overbreadth doctrine to all fundamental rights).

13

challenged as unconstitutional because of an alleged chilling effect on a large number of eligible voters, the challengers should not be required to prove that the law is invalid in all circumstances. This is due to the significance of the right, which requires a court to fully consider the challenge and the record before it to carefully and fully analyze the voting restriction under the Anderson/Burdick framework, which, depending on the severity of the burden imposed, may require the use of a heightened level of scrutiny. In other words, a purely facial challenge approach is unnecessarily rigid and simply does not recognize the fundamental importance of the right to vote. Therefore, under a modified facial challenge approach, I evaluate whether a substantial number of Act 23's applications are unconstitutional "judged in relation to the statute's plainly legitimate sweep."[36]

II. PROPER APPLICATION OF THE ANDERSON/BURDICK BALANCING TEST

¶104 I agree with the majority opinion[37] that the plaintiffs' challenge to Act 23 must be evaluated under the balancing test set forth in Anderson[38] and Burdick.[39] Under the Anderson/Burdick test, a court addressing a constitutional challenge to a voting regulation weighs the benefits and the burdens of the particular regulation at issue.[40] Not all voting

---

[36] See Wash. State Grange, 552 U.S. at 449 n.6.

[37] Majority op., ¶¶27-34, 40.

[38] Anderson, 460 U.S. 780.

[39] Burdick, 504 U.S. 428.

[40] Anderson, 460 U.S. at 789.

regulations are subject to strict scrutiny.[41] Instead, the level of judicial scrutiny that a court applies to a challenged voting regulation depends on the severity of the burden imposed by that regulation.[42] Therefore, a court must first consider the burden imposed by the voting regulation under review. A voting regulation that imposes a severe burden is constitutional only if it is narrowly tailored to achieve a compelling state interest.[43] On the other hand, a voting regulation that does not impose a severe burden on voters will be found constitutional as long as it is reasonably related to a governmental interest.[44]

¶105 Although the majority opinion cites to the Anderson/Burdick balancing test,[45] it does not engage in a straightforward application of the framework. Rather, instead of directly discussing the cost burden imposed by Act 23, as evidenced by the record, it unnecessarily considers whether the fees associated with obtaining a certified copy of a Wisconsin

---

[41] See Burdick, 504 U.S. at 433.

[42] Id. at 434.

[43] Id.

[44] See id. (citing Anderson, 460 U.S. at 788). The Anderson/Burdick test, which I apply, is consistent with this court's precedent. Prior Wisconsin Supreme Court cases that have evaluated election regulations have not identified the level of scrutiny that this court should apply, nor do these cases directly engage in a balancing test. More typically, this court has considered whether the election regulation under review was reasonable. See also State ex rel. Van Alstine v. Frear, 142 Wis. 320, 337, 125 N.W. 961 (1910) (citing State ex rel. Runge v. Anderson, 100 Wis. 523, 533-34, 76 N.W. 482 (1898)); Baker, 38 Wis. at 87.

[45] Majority op., ¶¶27-34, 40.

15

birth certificate, a requirement to obtain a free identification card for voting purposes, function as an unconstitutional poll tax.

¶106 The discussion of poll tax case law is misplaced for two reasons. First, the plaintiffs did not challenge Act 23 as an unconstitutional de facto poll tax; therefore, this issue was not briefed or argued by the parties. Second, and more importantly, the plaintiffs' challenge, brought under the Anderson/Burdick framework, requires this court to carefully evaluate the cost burden that Act 23 places on eligible voters. The Anderson/Burdick framework, rather than poll tax analysis, is appropriate because the photo identification requirements at issue are related to election qualifications.[46] In contrast, poll tax analysis is appropriate when the cost imposed on voters is not related to voter qualifications.[47] By evaluating the cost burden through the framework of poll tax cases, the majority opinion conflates two separate types of analysis and fails to consider sufficiently the cost burdens, which are well-established by the record, under the Anderson/Burdick balancing test. Although the majority concludes that the costs associated with obtaining Act 23-compliant identification impose an unconstitutional de facto poll tax that results in a severe burden, it improperly crafts a remedy, which purports to

---

[46] See League of Women Voters v. Walker, 2014 WI 97, ¶¶4-5, __ Wis. 2d __, __ N.W.2d __.

[47] See Crawford, 553 U.S. at 189; see also Harper, 383 U.S. at 670.

16

alleviate the burden by eliminating the cost of certified Wisconsin birth certificates under some circumstances. This remedy allows the majority to conclude that the burdens of Act 23 are minimal. By applying poll tax analysis and by crafting this remedy in the midst of the Anderson/Burdick framework, the majority has unnecessarily muddled an otherwise straightforward and tested analytical framework.

¶107 Even if I were to assume that poll tax analysis applied to this case, I am not persuaded that the majority opinion's remedy cures the unconstitutionality of Act 23. Anyone who thinks Act 23's constitutional problem is that it creates a de facto poll tax should want to guarantee that such a de facto poll tax is not imposed on any eligible voter. The majority concludes that Act 23 imposes a de facto poll tax; however, there is no support in the law for the proposition that a court may leave to the discretion of a governmental agency whether to approve an exception to a poll tax. If the majority leaves in place the discretion of DMV administrators to issue or refuse to issue Act 23-compliant identification where a fee is required for supporting documents,[48] it fails to guarantee constitutional protections against poll taxes. Such an approach also leaves the potential for future litigation brought by individuals who were denied the exception. This leaves the constitutionality of Act 23 unsettled unless the legislature acts to repair this defect.

---

[48] See majority op., ¶¶67, 70.

17

¶108 If, however, the majority opinion is requiring DMV administrators to issue photo identification to individuals who cannot afford to obtain underlying documentation,[49] it is directing a non-party to take specific action, which it cannot do.

¶109 Therefore, rather than relying on the majority opinion's poll tax analysis, I would apply the well-established Anderson/Burdick framework, which requires the conclusion that Act 23 places a severe burden on a substantial number of eligible Wisconsin voters. The severity of the burden dictates that this court may uphold Act 23 only if it is narrowly tailored to achieve a compelling governmental interest. The record demonstrates that Act 23 is not narrowly tailored to the state's goals of reducing voter fraud or increasing the public's confidence in elections because the Act is unlikely to further either of these goals in any meaningful way. Therefore, Act 23 is unconstitutional.

A. THE BURDENS IMPOSED BY ACT 23 ARE SEVERE

¶110 The plaintiffs allege that the costs, time, and effort associated with obtaining an Act 23-compliant form of identification impose a significant burden on a substantial number of eligible Wisconsin voters. I agree with the circuit court that these burdens are severe.

---

[49] See majority op., ¶7, ¶7 n.5.

18

## 1. A SUBSTANTIAL NUMBER OF ELIGIBLE WISCONSIN VOTERS LACK ACT 23-COMPLIANT IDENTIFICATION

¶111 The circuit court found that "[a] reasonable, reliable and accurate estimate of the number of people eligible to vote in Wisconsin who do not have a form of identification that would permit them to vote under Act 23 is 333,276."[50] Before reaching this conclusion, the circuit court heard the expert testimony of Professor Kenneth R. Mayer, the plantiffs' expert, as well as the testimony of Professor M.V. Hood and Dr. Peter Morrison, who both served as expert witnesses for the state.

¶112 The circuit court found Professor Mayer and Professor Hood to be qualified experts in terms of establishing the number of eligible Wisconsin voters who lack Act 23-compliant identification. In contrast, the circuit court did not find Dr. Morrison qualified to give expert testimony on the number of eligible voters in Wisconsin lacking Act 23-compliant identification. Although the circuit court considered the testimony of both Professor Mayer and Professor Hood, the circuit court ultimately relied on Professor Mayer's expert testimony.

---

[50] The circuit court opinion carefully explained how it came to this conclusion and described the data upon which it relied. In reviewing this data, it appears that a mathematical error occurred and that the number of estimated eligible Wisconsin voters who lack Act 23-compliant identification should be 333,296.

¶113 As the majority opinion correctly states, this court will uphold a circuit court's findings of fact unless they are clearly erroneous.[51] The circuit court's reliance on Professor Mayer's estimate that 333,276 eligible Wisconsin voters lack Act 23-compliant identification was not clearly erroneous.

¶114 Professor Mayer utilized the "exact-match" method to estimate the number of registered voters who lacked Act 23-compliant identification. Under this method, Professor Mayer matched the records of registered voters appearing in the Statewide Voter Registration System (SVRS), maintained by the Government Accountability Board (GAB), with records of individuals listed as having either a Wisconsin driver's license or a Wisconsin identification card in a Department of Transportation (DOT) database. The comparison of the SVRS database with the DOT database allowed Professor Mayer to form an initial estimate of the total number of registered voters who lack two of the primary forms of Act 23-compliant identification. Professor Mayer also estimated the number of non-registered, but otherwise eligible, voters who lacked proper identification and the number of individuals who possessed student, tribal, or military identification that would allow them to vote under Act 23.

---

[51] Majority op., ¶21 (citing State v. Arias, 2008 WI 84, ¶12, 311 Wis. 2d 358, 752 N.W.2d 748).

20

¶115 Professor Mayer's estimates controlled for individuals who appeared in the DOT database but who had either moved out of state or who had passed away. For example, he utilized census data from the American Community Survey (ACS) to estimate that 277,000 individuals listed as having a Wisconsin driver's license in DMV records had moved out of state. Professor Mayer also relied on a sample of obituaries and the rate at which licenses and identification cards expire each year to determine that approximately 114,690 individuals listed in the DOT database as having photo identification are actually deceased. Finally, Professor Mayer removed duplicate listings of individuals who appeared in the DOT database as having both a driver's license and a state identification card.

¶116 Professor Mayer presented clear and concise testimony that relayed his expert report findings to the circuit court. These findings pointed out a variety of imperfections with the DOT database upon which Professor Mayer and Professor Hood relied. In contrast to Professor Mayer, Professor Hood was unable to provide an estimate of the number of eligible Wisconsin voters who lack Act 23-compliant identification. In reference to relying on Professor Mayer instead of Professor Hood, the circuit court logically explained that Professor Hood did not "adequately explain or justify [his] conclusion that the Wisconsin data available, when evaluated using the 'exact

[m]atch' method was not sufficiently reliable to estimate the number of eligible voters who lack the required Photo ID."

¶117 Furthermore, the circuit court was not clearly erroneous in finding that the state's other expert witness, Dr. Morrison, did not "possess sufficient training or experience to prepare or to offer reliable expert testimony as to election procedures generally nor, specifically, the proportion of persons eligible to vote in Wisconsin who lack a Photo ID required by Act 23." The circuit court identified several problems with Dr. Morrison's testimony. These included Dr. Morrison's failure to consider a "significant source of relevant, reliable information, the SRVS listing of eligible Wisconsin voters" and his failure to "recognize or take into account the limitations of the WisDOT data."

¶118 Although the circuit court found that an estimated 333,276 eligible Wisconsin voters do not possess Act 23-compliant identification, this finding alone does not indicate the severity of the burden that individuals would face in obtaining a compliant form of identification. However, the record provides ample evidence of the severity of the burden Act 23 imposes.

2. THE COST INCURRED BY ELIGIBLE WISCONSIN VOTERS OBTAINING ACT 23-COMPLIANT IDENTIFICATION IMPOSES A SERVERE BURDEN

¶119 The most significant burden that Act 23 imposes on individuals lacking Act 23-compliant identification is the cost

burden that results from the administrative framework in which Act 23 operates. As the majority opinion explains, typically, an individual must produce a certified copy of his or her birth certificate, among other documents, to receive a no-cost identification card for voting purposes.[52] The legislature has dictated, under the current administrative framework, that a certified copy of a Wisconsin birth certificate costs $20.[53] The majority concludes that the $20 cost of a certified Wisconsin birth certificate functions as an unconstitutional fee or poll tax that imposes a severe burden.[54] However, this conclusion unnecessarily muddles poll tax analysis with the Anderson/Burdick framework. In addition, the majority opinion does not fully address the cost burden imposed on eligible Wisconsin voters who need to obtain a birth certificate from another state to obtain photo identification for voting purposes. Finally, the majority opinion does not consider the severity of the burden that Act 23 places on naturalized

---

[52] See majority op., ¶52 n.12.

[53] Id., ¶¶14, 61; Wis. Stat. § 69.22(1)(a),(c).

[54] Majority op., ¶62.

citizens who are eligible to vote in Wisconsin.[55] In sum, the majority's remedy does not relieve the cost burden placed on eligible Wisconsin voters born in other states or countries.

¶120 The circuit court found that "[t]he cost and the difficulty of obtaining documents necessary to apply for a DMV Photo ID is a substantial burden which falls most heavily upon low income individuals."[56] The circuit court's finding is supported by the record; therefore, it is not clearly erroneous.

¶121 The circuit court specifically noted the cost burden that Act 23 imposed upon several different individuals in its decision and order. For example, the experiences of Ruthelle R. Frank and Ricky T. Lewis indicate that they would be forced to incur significant costs to correct errors in their birth certificates to obtain Act 23-compliant photo identification. At the time Lewis sought photo identification, his affidavit indicated that his sole income is his fixed veteran's pension of

---

[55] One form of Act 23-compliant identification includes a certificate of naturalization issued "not earlier than 2 years before the date of an election at which it is presented." Wis. Stat. § 5.02(6m)(b). This means that a certificate of naturalization that is more than two years old cannot be used as a compliant form of identification at the polls under Act 23. Therefore, it appears that a naturalized citizen may be required to obtain another form of Act 23-compliant identification, which in some cases could require foreign-born individuals to obtain a foreign certificate of birth.

[56] The amicus curiae briefs submitted by AARP and Disability Rights Wisconsin provide convincing arguments that Act 23 disproportionally burdens Wisconsin residents over the age of 65 and Wisconsin residents with disabilities, respectively.

$986 per month and that he has no savings.[57] He stated that his attempts to obtain identification have resulted in what he considered to be "substantial costs." Additionally, the circuit court noted that Sequoia Cole's only income is $600 per month in Social Security benefits, and in her deposition she stated that the $20 fee for a birth certificate was a burden.

¶122 The record also contains numerous affidavits and depositions from individuals regarding the cost burden that Act 23 imposes. The majority of these individuals have low incomes. For example, Ndidi Brownlee's deposition indicates that she has no savings and that she lives month to month on her income. Johnnie Garland's affidavit states that she relies on Social Security benefits that total $678 per month to cover her essential expenses and that she was required to pay $28 to obtain her birth certificate from another state. Kristen Green was unemployed at the time she obtained photo identification, and her deposition indicates that she could not afford the extra bus fare she needed to travel to a DMV office. Danettea Lane's affidavit indicates that she had to pay $20 to obtain her birth certificate and that she supports herself and her four children on $608 per month. In addition, Willie Watson and Eldridge King both indicated in their depositions that they lived on fixed amounts of $683 per month and $1000 per month, respectively.

---

[57] The circuit court later stated that Lewis' monthly income was $1021, which it based on his deposition.

25

¶123 In Frank v. Walker, the United States District Court for the Eastern District of Wisconsin recently considered a challenge to Act 23 brought under the Fourteenth Amendment and the Federal Voting Rights Act.[58] While I do not rely on the district court's analysis in Frank, the similarities between the Frank case and this case make many of the district court's findings quite persuasive. In Frank, the district court made persuasive findings in regard to the cost burden that Act 23 imposes.[59] Like the circuit court in this case, the district court considered the testimony of individuals lacking Act 23-compliant photo identification to conclude that the cost burden imposed by the Act is severe.[60] The district court concluded,

> [I]n light of the evidence presented at trial, it is also clear that for many voters, especially those who are low income, the burdens associated with obtaining an ID will be anything but minor. Therefore, I conclude that Act 23 will deter a substantial number of eligible voters from casting a ballot."[61]

¶124 Based on the record in this case, which is remarkably similar to the record before the district court in Frank, it was

---

[58] Frank v. Walker, No. 2011-CV-1128, slip op. at 1 (E.D. Wis. Apr. 29, 2014).

[59] Id. at 31-34. Seven of the eight people who testified in Frank are low-income individuals and an expert witness who testified at that trial established that "[a] substantial number of the 300,000 plus eligible voters who lack a photo ID are low-income." Id. at 24.

[60] Id. at 37.

[61] Id.

26

not clearly erroneous for the circuit court to conclude that Act 23 places severe cost burdens on a substantial number of eligible Wisconsin voters who lack Act 23-compliant identification.

### 3. THE TIME AND EFFORT NECESSARY TO OBTAIN ACT 23-COMPLIANT IDENTIFICATION CONTRIBUTES TO THE SEVERITY OF THE BURDEN

¶125 Contrary to the majority opinion, I conclude that the time spent and difficulties encountered by individuals trying to obtain Act 23-compliant identification are significant and contribute to the severity of the burden.[62] The fact that the majority of the plaintiffs in this case eventually obtained a photo identification card for voting purposes does not mean that no burden exists.[63] This is because the burden analysis requires the court to consider the time spent, the obstacles encountered, and the costs paid in obtaining the identification, and not merely the end result of these efforts.

¶126 Here, the circuit court found, "Procuring a DMV Photo ID can easily be a frustrating, complex, and time-consuming process." It further concluded that "[t]he cost and the difficulty of obtaining documents necessary to apply for a DMV Photo ID is a significant burden upon the opportunity of Wisconsin citizens to vote."

---

[62] See majority op., ¶¶41-48.

[63] See id., ¶42.

¶127 The circuit court relied on affidavits and depositions from numerous individuals who described the time spent and difficulties incurred in obtaining or attempting to obtain Act 23-compliant identification.  In its decision and order, the circuit court specifically relied upon the experiences of Ruthelle R. Frank and Ricky T. Lewis who each had frustrating experiences in attempting to obtain photo identification. Errors on birth certificates caused this difficulty and prevented both individuals from obtaining photo identification. Lewis estimated in his deposition that he spent 10 to 15 hours attempting to obtain identification.  The circuit court also relied upon the experiences of Sequoia Cole, Brittany Cramer, and Joel Torres who all explained that obtaining photo identification took a substantial amount of time——up to 6.5 hours in one case.  A majority of the individuals cited by the circuit court made multiple trips to DMV service centers and other state agencies in attempting to obtain Act 23-compliant photo identification.

¶128 In addition to the individuals cited in the circuit court's decision, the record also contains a number of other affidavits and depositions that describe the time and difficulty burden that Act 23 imposes.  For example, Ndidi Brownlee spent several hours traveling to and then waiting at the DMV.  Cheryl Edwards' affidavit states that she spent roughly nine hours assisting family members who needed to obtain photo

identification for voting purposes. Kristen Green's affidavit indicates that she made multiple trips to the DMV to obtain photo identification and that her combined trips totaled almost five hours. Danettea Lane's affidavit states that she spent nearly 10 hours during the process of obtaining identification. Mary McClintock, who uses a wheelchair, was required to arrange special transportation and spent approximately nine hours in the process of obtaining identification. The record also reflects that Jennifer Platt's trip to the DMV took three hours. Speciall Simmons stated in his affidavit that it took him three hours to obtain identification. Willie Watson spent approximately four hours arranging transportation that would allow him to apply for identification. John Wolfe's affidavit and deposition testimony indicated that the closest DMV was 30 to 40 miles out of his way.

¶129 As the previous discussion demonstrates, the record fully supports the circuit court's conclusions pertaining to the time, effort, and difficulty burdens. Therefore, the circuit court's determination that the difficulties imposed by Act 23 result in a severe burden was not clearly erroneous.

¶130 In coming to the opposite conclusion, the majority opinion notes that photo identification is part of the reality of daily life.[64] This may be true; however, that does not

---

[64] Id., ¶44.

diminish the burdens that Act 23 imposes on individuals who accomplish their daily responsibilities without any form of photo identification that would meet the requirements of Act 23. In Frank, the United States District Court for the Eastern District of Wisconsin addressed the impact that Act 23 has on individuals who currently conduct their daily lives without any form of Act 23-compliant identification.[65] The district court stated,

> [A] person whose daily life did not require possession of a photo ID prior to the imposition of the photo ID requirement is unlikely to derive any benefit from possessing a photo ID other than the ability to continue voting. Yet that person must pay the same costs——in the form of the hassle of obtaining the underlying documents and making a trip to the DMV——as the person who obtained the ID for driving.[66]

¶131 The district court in Frank, relying on the testimony of numerous individuals lacking Act 23-compliant identification, also specifically considered the time and difficulty burden imposed by Act 23. In doing so, it considered the number of DMV service centers in the state and noted that only two centers in the entire state are open past 5 p.m. and that only one DMV service center in

---

[65] Frank v. Walker, No. 2011-CV-1128, slip op. at 11 (E.D. Wis. Apr. 29, 2014).

[66] Id.

the state is open on the weekend.[67]  This fact led the district court to conclude that individuals will likely have to take time off of work and forfeit hourly wages to obtain a voter identification card from a DMV center during business hours.[68]  If an individual is required to obtain underlying documents from other state agencies, then the amount of time and lost wages increases.[69]

¶132 The district court also heard testimony that indicated that not all DMV centers are accessible by public transportation.[70]  In reaching its conclusion that Act 23 imposes severe burdens on individuals, it considered these transportation difficulties especially in light of low-income Wisconsin residents who rely primarily on public transportation.[71]

---

[67] Id. at 30.  The amicus brief submitted by Institute for One Wisconsin similarly explains that "the DMV services centers are open for limited hours.  Indeed, 41 are open just two days each week, seven are open just a few hours for one day each month, and three are open just one day every quarter."

[68] Id.

[69] Id. at 31.

[70] Id.  Disability Rights Wisconsin's amicus brief also notes transportation difficulties for eligible Wisconsin voters living with disabilities as well as eligible voters living in rural areas.

[71] Id. at 30.

¶133 The majority opinion's reliance on the Crawford[72] decision's discussion of the time required and other obstacles faced, such as "life's vagaries,"[73] fails to convince me that the circuit court's findings were clearly erroneous. The majority opinion cites to Crawford for the proposition that trips to the DMV and other difficulties suffered to obtain a voter identification card cannot constitute a severe burden.[74] However, the majority opinion's selective reliance on portions of Crawford ignores the fact that the United States Supreme Court was satisfied that the affidavit exception[75] to Indiana's voter ID law alleviated some of the burdens of "life's vagaries."[76] In addition, the majority opinion ignores the following language from Crawford,

> Both evidence in the record and facts of which we may
> take judicial notice, however, indicate that a

---

[72] 553 U.S. 181 (2008).

[73] Majority op., ¶43.

[74] Id.

[75] The Indiana voter identification law provides that "[a] voter who is indigent or has a religious objection to being photographed may cast a provisional ballot that will be counted only if she executes an appropriate affidavit before the circuit court clerk within 10 days following the election." Crawford, 553 U.S. at 186 (2008) (citing Ind. Code Ann. §§ 3-11.7-5-1 (West Supp. 2007), 3-11.7-5-2.5(c) (West 2006)). In contrast to the Indiana voter identification law, Act 23 provides no such affidavit exception.

[76] Id. at 197-98.

somewhat heavier burden may be placed on a limited number of persons. They include elderly persons born out of State, who may have difficulty obtaining a birth certificate; persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification; homeless persons; and persons with a religious objection to being photographed. If we assume, as the evidence suggests, that some members of these classes were registered voters when SEA 483 was enacted, the new identification requirement may have imposed a special burden on their right to vote.[77]

¶134 In sum, both the record in this case and the _Frank_ decision support the circuit court's finding that the time, effort, and difficulty burden that Act 23 imposes is severe.

## B. ACT 23 IS NOT NARROWLY TAILORED TO ACHIEVE ANY COMPELLING STATE INTEREST

¶135 The circuit court's finding that Act 23 places a severe burden on a substantial number of eligible Wisconsin voters who lack Act 23-compliant identification must be upheld; therefore, the Act is constitutional only if it is narrowly tailored to achieve a compelling state interest.[78]

¶136 The state asserts that Act 23 has two primary and compelling benefits: the reduction of voter fraud and the

---

[77] _Id._ at 199 (emphasis added) (footnote omitted).

[78] _Burdick_, 504 U.S. at 434. As previously discussed, the majority opinion interprets administrative rules to craft a remedy that attempts to reduce the burden placed on voters. This does not follow from the _Anderson/Burdick_ framework. Because of the majority opinion's approach, it concludes that rational basis scrutiny applies. See majority op., ¶¶72-80 (discussing the benefits of Act 23).

33

increase of voter confidence in the outcome of elections. In considering these alleged benefits, the circuit court found that "[t]he Photo ID requirements of Act 23 are unlikely to protect the electoral process" and "[t]he Photo ID requirements of Act 23 are not narrowly tailored to achieve a goal of voter verification." Specifically, the circuit court found,

> Since 2004, voter fraud investigations have been undertaken by the Milwaukee Police Department, by the Mayor of Milwaukee and by the Wisconsin Department of Justice, working with various county prosecutors working through the Attorney General's Election Fraud Task Force. None of these efforts have produced a prosecution of a voter fraud violation that would have been prevented by the voter ID requirements of Act 23.

¶137 Finally, in referencing voter fraud and summarizing its holding, the circuit court stated,

> Act 23 addresses a problem which is very limited, if indeed it exists. It does not appear to recognize or to account for the difficulty its demands impose upon indigent and elderly citizens who are eligible under the constitution to vote. It offers no flexibility, no alternative to prevent the exclusion of a constitutionally qualified voter. Given the sacred, fundamental interest at issue, it is clear that Act 23, while perhaps addressing a legitimate concern, is not sufficiently narrow to avoid needless and significant impairment of the right to vote. The enactment steps beyond the proper authority of the legislature and is in violation of the Wisconsin Constitution, Article III, Section 1.

The circuit court's findings in regard to the lack of benefits associated with Act 23 and its determination that the Act is not narrowly tailored to achieve these benefits are supported by the record, and thus, are not clearly erroneous; therefore, the circuit court's findings must be upheld.

34

¶138 In regard to the allegation that Act 23 reduces voter fraud, the circuit court heard testimony regarding incidents of voter fraud and considered the current penalties in place to deter voter fraud.[79] One indication that Act 23 is not narrowly tailored to reduce voter fraud is that incidents of voter fraud in general are almost non-existent. An even greater indication that Act 23 is not narrowly tailored to prevent voter fraud is that the photo identification requirements of the Act would not prevent the types of voter fraud that have been uncovered during recent investigations.

¶139 The circuit court heard testimony from Professor Mayer regarding a lack of voter fraud in Wisconsin generally as well as a lack of impersonation voter fraud, which Act 23 is most likely to prevent. Professor Mayer based his testimony on academic studies of voter fraud, as well as studies conducted in 2004 and 2008 of voter fraud in Wisconsin. He concluded and testified that "there is virtually no evidence at all that in-

---

[79] Wisconsin statutes criminalize voter fraud as Class I felonies and impose penalties of up to 3.5 years in prison or up to a $10,000 fine, or both. See Wis. Stats. §§ 12.13 (governing various forms of election fraud), 12.60 (detailing the penalty structure for crimes related to election fraud), 939.50 (outlining the classification structure of felonies). In reference to the strict penalties imposed on fraudulent voting, the district court in Frank stated, "As the plaintiffs' unrebutted evidence shows, a person would have to be insane to commit voter-impersonation fraud." Frank v. Walker, No. 2011-CV-1128, slip op. at 8 (E.D. Wis. Apr. 29, 2014).

person voter impersonation at the polling places occurs with any frequency, if it occurs at all."

¶140 Professor Mayer also reviewed incidents of voter fraud detected by a 2008 Department of Justice (DOJ) investigation. The DOJ investigation followed the 2008 presidential election. As a result of the investigation, the State brought charges in 20 cases of election fraud. These charges included eleven cases of felons voting, two double voting cases, six cases of misconduct related to voter registration, and one fraudulent case of absentee voting. This investigation resulted in no charges of impersonation voter fraud.

¶141 Professor Mayer testified that the photo identification requirements of Act 23 would not have prevented any of the types of voter fraud identified in the 2008 DOJ investigation. For example, the photo identification requirements of Act 23 would not prevent a felon from voting because any felon with Act 23-compliant photo identification could cast a ballot. In the two cases of double-voting, individuals voted absentee and were also allowed to vote in-person because of poor record keeping. In Professor Mayer's expert opinion, photo identification would not have prevented these two individuals from voting in person, since poll workers had no record that they had already voted absentee. Furthermore, the photo identification requirements of Act 23 would not have prevented the cases of fraudulent voter

registration because there is no photo identification requirement to register to vote.

¶142 Furthermore, the circuit court found that "a comprehensive study of voter attitudes has found that state photo ID requirements appear to have no effect upon public confidence in the process." In reaching this conclusion, the circuit court relied on Professor Mayer's January 16, 2011, report in which he reviewed the findings of the Cooperative Congressional Election Study (CCES). Professor Mayer's report explains a study of the CCES, which stated, "ID laws will have little or no effect on the confidence in the electoral system or the belief in the incidence of fraud. Those beliefs . . . are not different when a stricter ID law is in place and enforced than when less invasive voter-authentication methods are used." There is nothing in the record that disputes Professor Mayer's interpretation of the CCES or the circuit court's finding that Act 23 does not increase voter confidence in election outcomes.

¶143 The majority opinion asserts that the "State has a significant and compelling interest in protecting the integrity and reliability of the electoral process, as well as promoting the public's confidence in elections."[80] However, both the majority opinion and the record in this case fail to demonstrate how Act 23's photo identification requirement promotes either of

---

[80] Majority op., ¶73 (citing Crawford, 553 U.S. at 196).

these state interests in any meaningful way. Therefore, I agree with the circuit court's findings that Act 23 is not narrowly tailored to the State's interests of decreasing voter fraud or increasing public confidence in the outcome of elections. The result is that Act 23 is unconstitutional.

### III. THE PROPER REMEDY

¶144 Consideration of the proper remedy is appropriate after considering the burdens of Act 23, the applicable level of judicial scrutiny, and the benefits of the Act. In the midst of discussing the Anderson/Burdick framework, however, the majority opinion interprets administrative rules in a way that allows for an exception to the cost of obtaining a certified copy of a birth certificate for some individuals. There is no dispute that a court must determine whether legislation challenged as unconstitutional may be interpreted in a way to avoid invalidation.[81] However, the majority's approach is absolutely contrary to the role of this court and essentially invades the legislative function because it is not actually interpreting Act 23, the challenged legislation, in a way that cures the Act's unconstitutionality. Instead, the majority reaches outside of the challenged legislation and interprets existing

---

[81] See Crowell v. Benson, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

administrative code provisions in its attempt to salvage an unconstitutional Act. This approach results in a direction to an administrative agency that is not a party in this case. The majority cites no authority that supports this novel approach.

¶145 The majority opinion directs DMV administrators to deem any document requiring a payment to a government agency "unavailable" for purposes of the Wisconsin Administrative Code § Trans 102.15(3)(b) exception.[82] The majority may also be directing DMV administrators to accept an individual's written petition for the exception.[83] Either approach involves directing a non-party.

¶146 The conclusion that the majority opinion cannot direct agency administrators who are non-parties to this case is supported by Wisconsin civil procedure and our case law. For example, Wis. Stat. § 801.05 governs personal jurisdiction and provides that a court has "jurisdiction over a person served in an action . . . ."[84] This court has explained,

> A summons serves two purposes. First, a summons provides notice to the defendant that an action has been commenced against the defendant. Indeed, notice that apprises a party of the pendency of an action against it and affords the opportunity to present objections is regarded as "[a]n elementary and fundamental requirement of due process." Second,

---

[82] Majority op. ¶¶69-70.

[83] Majority op., ¶¶7, 7 n.5, 70.

[84] Wis. Stat. § 801.05.

consistent with Wis. Stat. §§ 801.05 and 801.11, a summons confers personal jurisdiction on a court over the defendant served.[85]

In addition, "[i]f a person is not named in a lawsuit, that person is a stranger to the court and cannot be bound by it."[86] These are essential principles governing jurisdiction that the majority opinion fails to consider when directing DMV administrators to take action. The issue of directing a non-party to exercise discretion or to take action is not a "straw man,"[87] but rather it involves basic principles of jurisdiction and civil procedure.

¶147 The majority's approach is also inconsistent with how courts typically interact with administrative agencies. For example, courts tasked with reviewing agency actions must adhere to strict statutory guidelines that allow the court to maintain subject matter jurisdiction.[88] No court, including our court, has any authority to direct action by an administrative agency unless that court has jurisdiction to do so. We have no jurisdiction to act here as the majority attempts to do so.

---

[85] Johnson v. Cintas Corp. No. 2, 2012 WI 31, ¶24, 339 Wis. 2d 493, 811 N.W.2d 756 (citations omitted).

[86] Bulik v. Arrow Realty, Inc. of Racine, 148 Wis. 2d 441, 444, 434 N.W.2d 853 (Ct. App. 1988).

[87] Majority op., ¶71 n.17.

[88] See Wis. Stat. § 227.53; see also Schiller v. DILHR, 103 Wis. 2d 353, 355, 390 N.W.2d 5 (Ct. App. 1981) (citing Kegonsa Joint Sanitary Dist. v. City of Stoughton, 87 Wis. 2d 131, 274 N.W.2d 598 (1979)).

¶148 Contrary to the majority opinion, I conclude that the appropriate remedy is invalidation of Act 23. If the legislature chooses, it may enact a constitutional version of Act 23 considering the administrative framework in which the Act functions——that is, one that does not severely burden any eligible Wisconsin voter. To avoid the unconstitutionality of the majority's remedy and put in place a voter identification law that is unquestionably enforceable, the legislature should look to Indiana's voter identification law, which the United States Supreme Court upheld in Crawford. A clear legislative directive preserves the essential separation of legislative and judicial powers that the Wisconsin Constitution requires.[89]

¶149 Constitutional issues that "are peppered with political perceptions and emotionally laden views" require courts to exercise judicial restraint.[90] This court exercised judicial restraint in the context of public school funding in Kudor v. Grover,[91] and this court should likewise exercise caution in its review of Act 23. This is because voter identification laws such as Act 23 involve highly politicized issues that concern complicated matters of public policy.

---

[89] Wagner Mobil, Inc. v. City of Madison, 190 Wis. 2d 585, 594 n.4, 527 N.W.2d 301 (1995).

[90] Kukor v. Grover, 148 Wis. 2d 469, 504, 436 N.W.2d 568 (1989) (addressing a constitutional challenge to public school funding).

[91] Id.

¶150 In discussing remedy in <u>Frank</u> the district court came to a similar conclusion. The district court remarked,

> The plaintiffs suggest that I could order the defendants to allow eligible voters without photo IDs to vote without showing an ID or by signing an affidavit affirming their identities and lack of an ID. However, ordering such relief would be the functional equivalent of enjoining the current law and replacing it with a new law drafted by me rather than the state legislature. . . . To grant this remedy, I would need to make a policy judgment as to whether eligible voters who do not have IDs should be required to sign affidavits of identity before receiving a ballot. And, if I found that an affidavit was required, I would need to decide what language the affidavit should contain. Once I issued this relief, I would have to supervise the state's election-administration officials to ensure that they were properly implementing my instructions. These tasks are outside the limited institutional competence of a federal court, and therefore I may not rewrite the photo ID requirement to conform it to constitutional requirements.[92]

¶151 A Wisconsin statute allows unconstitutional portions of laws to be severed under certain circumstances;[93] however,

---

[92] <u>Frank v. Walker</u>, No. 2011-CV-1128, slip op. at 39 (E.D. Wis. Apr. 29, 2014).

[93] Wis. Stat. § 990.001 states, "In construing Wisconsin laws the following rules shall be observed unless construction in accordance with a rule would produce a result inconsistent with the manifest intent of the legislature: . . . ." Subsection (11) provides,

> The provisions of the statutes are severable. The provisions of any session law are severable. If any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application.

this remedy is not applicable to Act 23. This is because the unconstitutionality of Act 23 is a result of how the law functions within a greater body of administrative rules. In other words, there is no portion of Act 23 that could be severed that would cure the unconstitutionality of the Act.

¶152 The United States Supreme Court has explained that courts must avoid judicial legislation and should avoid editing statutory text.[94] Furthermore, the Supreme Court has illuminated three key principles underlying remedies.[95] First, a court should seek to invalidate as little of the legislature's work as possible.[96] Second, a court must refrain from rewriting unconstitutional state laws.[97] Third, a court must consider legislative intent in attempting to salvage an unconstitutional law.[98]

¶153 After considering these principles and the inability of this court to sever a specifically unconstitutional portion of Act 23 that would save the law, I conclude that the only applicable remedy is invalidation of Act 23. Act 23 functions within a regulatory framework established by the Wisconsin legislature, which imposes a cost for birth certificates. I

---

[94] United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 478-79 (1995).

[95] Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 329 (2006).

[96] Id.

[97] Id.

[98] Id. at 330.

agree with the majority opinion that the legislature could eliminate this cost.[99] It could also institute another type of exception to the Act's requirements that could lessen the severity of the burden imposed on certain eligible Wisconsin voters, such as the affidavit exception found in Indiana's voter identification law.[100] However, it is the role of the legislature and not this court to institute such changes to Act 23 or to the framework in which the Act operates. It is unknown whether the majority opinion's remedy will function effectively or how that remedy will be enforced. Finally, the majority opinion's remedy fails to consider policy considerations, budgetary constraints, and legislative intent. It is the legislature and not this court that should address the unconstitutionality of Act 23.

## IV.  CONCLUSION

¶154 I cannot agree with the majority opinion's characterization and analysis of the plaintiffs' challenge. The majority incorrectly characterizes the challenge as a purely facial challenge. It fails to apply the Anderson/Burdick framework correctly. It improperly relies on poll tax case law. Even if I were to assume that poll tax analysis applied, the

---

[99] Majority op., ¶62.

[100] See Crawford, 553 U.S. at 186, 199 (discussing the affidavit exception to Indiana's voter identification law). Specifically, part of the affidavit exception to Indiana's voter identification law allows provisional ballots cast by indigent voters to be counted if the voter "executes an affidavit before the circuit court clerk or county election board" in accordance with statutory requirements. Ind. Code Ann. § 3-11.7-5-2.5 (West 2011).

44

majority's attempt to alleviate the de facto poll tax for some eligible Wisconsin voters results in an unworkable solution that fails to cure the unconstitutionality of Act 23. Specifically, the majority opinion's remedy appears to leave in place the discretion of DMV administrators to issue or refuse to issue Act 23-compliant identification where a fee is required for supporting documents. If the majority opinion leaves in place the discretion of DMV administrators to issue exceptions to those burdened by the cost of obtaining underlying documentation, it fails to guarantee constitutional protections against poll taxes. On the other hand, if the majority opinion requires DMV administrators to issue photo identification cards to individuals who are burdened by the cost of obtaining required underlying documentation, then it is directing a non-party to take specific action, which it has no authority to do. In sum, the remedy imposed by the majority, under either approach, is flawed. Furthermore, its remedy impinges on the legislature's role by interpreting administrative code provisions that are not part of this challenge and by directing an administrative agency that is not a party to this case. I urge the legislature to take action to cure the unconstitutionality of Act 23. Without such action, the remedy crafted by the majority leaves Act 23 unconstitutional.

¶155 The United States Supreme Court's decision in Crawford v. Marion County Election Board,[101] which upheld Indiana's voter identification statute, does not persuade me that Act 23 is

---

[101] Crawford, 553 U.S. 181.

constitutional. This is because there are substantial differences between this case and the Crawford case. First, the record in the Crawford case was not nearly as developed as the record in this case. This factor certainty influenced the Supreme Court's decision.[102] Second, Indiana's voter identification statute is not as stringent as Act 23. Most importantly, the Indiana law provides for an affidavit exception that allows certain individuals to vote without photo identification.[103] In upholding Indiana's voter identification law, Justice Stevens' lead opinion commented that the severity of the burden imposed by the photo identification requirement "is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted."[104] Finally, while Act 23 applies to both in-person and absentee voting, Indiana's photo identification requirements do not apply to absentee voting. Therefore, the Crawford case is neither controlling nor persuasive.

¶156 The question of whether Act 23 violates the Wisconsin Constitution is at the intersection of profound democratic

---

[102] Id. at 200 ("But on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters . . . . [T]he record does not provide us with the number of registered voters without photo identification . . . .").

[103] Id. at 186 (describing the affidavit procedure available to indigent voters as well as individuals with a religious objection to being photographed).

[104] Id. at 199.

principles: the right of qualified Wisconsin citizens to vote, as explicitly guaranteed by the Wisconsin Constitution, and the undisputed principle that the state has a legitimate interest in safeguarding the integrity of elections through regulations. Voter identification provisions are one way the state may choose to protect the legitimacy of elections. Such provisions may be constitutionally imposed even if they severely burden a person's right to vote, as long as they are narrowly tailored to advance a compelling state interest. However, Act 23's photo identification requirements severely burden eligible voters without being narrowly tailored to achieve the state's compelling interests of reducing voter fraud and increasing voter confidence in the outcomes of elections. For that reason, Act 23 is an unconstitutional election regulation, and I therefore respectfully dissent.

¶157 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

47